**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Francis DITOMMASO a/k/a "Checco", Rudolfo Risatti, a/k/a "Rudy", Sheila Silvetti, Victoriano Molina-Chacon, Defendants-Appellants.**

Nos. 612–615, Dockets 86–1371 to 86–1373 and 86–1377.

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1986.

Decided April 20, 1987.

See also, D.C., 625 F.Supp. 338, D.C., 627 F.Supp. 1253, D.C., 638 F.Supp. 300.

Bennett L. Gershman, White Plains, N.Y. for defendant-appellant, Francis DiTommasso.

Kenneth Weinstein, Garden City, N.Y. (Laurie S. Hershey, of counsel), for defendant-appellant, Rudolfo Risatti.

Alan Scribner, Contoocook, N.H., for defendant-appellant, Sheila Silvetti.

Barry E. Schulman, Brooklyn, N.Y. (Schulman & Laifer, Michael A. O'Connor, and Doreen T. O'Connor, of counsel), for defendant-appellant, Victoriano Molina-Chacon.

George B. Daniels, Asst. U.S. Atty. for E.D.N.Y. (Andrew J. Maloney, U.S. Atty., David V. Kirby, Peter Ball, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for plaintiff-appellee, the U.S.

Before OAKES, CARDAMONE and DAVIS,* Circuit Judges.

DAVIS, Circuit Judge:

* Honorable Oscar H. Davis, of the United States Court of Appeals for the Federal Circuit, sitting

## BACKGROUND [1]

In late 1981, Antonio Turano, a United States resident, Gaetano Giuffrida, a resident of Italy, and Victoriano Molina-Chacon, a resident of Spain, formed a partnership, ostensibly for the purpose of operating a multinational shoe business. The trio employed Rudolfo Risatti as chief shoe salesman with responsibility for the collection of accounts receivable. From the outset, the joint enterprise suffered from serious financial difficulties and Risatti's claimed adjusted gross income from shoe sales in 1982 was approximately $2000. Although the sale of footwear failed to generate profits for the partnership, the shoe business served as a front for a far more lucrative collaboration: a multi-million dollar heroin importation and distribution ring.

Street sales of heroin netted immense cash profits, typically in dirty and used paper bills of small denominations. In order to transport their gain out of the country undetected, the group instituted a two-step operation. First, by various means, the small denominations were converted to larger denominations (usually $100 bills) so that the money could be more easily concealed when transported. Second, the freshly laundered drug profits were then quietly smuggled out of the country and deposited into foreign bank accounts. Throughout 1982 and the first part of 1983, Sheila Silvetti and Francis DiTommaso assumed active roles in the illegal laundering and international smuggling of the illicit drug profits.[2]

During the Spring of 1982, Molina-Chacon started his own shoe outlet named Mintor Shoes. Although by this time Risatti had left the employ of Giuffrida and Turano, he continued in his capacity as salesman for Mintor Shoes. In October of that year, federal officials in New York intercepted a shipment of 15 kilograms of heroin from Thailand. This led to the arrest of both Giuffrida and Turano. Ultimately, the charges against Giuffrida were dropped and he returned to Italy. Turano was less fortunate. Following his release on bail[3] but prior to facing trial, Turano was killed.

Upon Giuffrida's return to Italy, Italian authorities installed wiretaps on his home and office phones. From early November 1982 through January 1983, authorities intercepted numerous conversations between Giuffrida and Molina-Chacon. Their discussions touched upon a wide variety of business matters ranging from details of particular money-laundering schemes to potential problems created by Turano's arrest. During one conversation, Molina-Chacon emphasized that whenever he was in Spain he relied upon Rudolfo Risatti in New York to keep him informed about the progress of the money laundering activities. Another discussion focussed on Anthony Castelbuono, Sheila Silvetti's paramour and a principal player in the various money laundering and smuggling operations. Because Castelbuono had squandered more than $1,000,000 in drug profits while gambling during a laundering trip to Atlantic City, Molina-Chacon and Giuffrida contemplated whether Castelbuono should be killed.

In January 1983 Molina-Chacon and Giuffrida discussed a shipment of shoes which was being prepared to be sent from Italy to Mintor Shoes, the New York outlet owned by Molina-Chacon. Later that month, Molina-Chacon personally travelled to Florence, Italy, to inspect the shipment. Just before the cargo was scheduled to leave Italy, he returned to the United States. The next day, Italian authorities seized the 160 carton shoe shipment and made several ar-

---

by designation.

1. The trial court did not make any explicit findings of fact supported by the evidence. However, because the Government's overall version of the facts is entirely consistent with the jury verdicts and is supported by substantial evidence of record, we generally follow it for purposes of this appeal because obviously it is the evidence most favorable to the Government.

2. Their participation in various drug-related transactions and travels will be discussed in greater detail later in this opinion to the extent necessary to illuminate the disposition of their appeals.

3. Rudolfo Risatti, among others, signed Turano's bail bond as surety.

rests. A thorough search of the goods disclosed a half-kilogram of pure heroin stashed in the middle shoe box in each of the 160 cartons. The total haul, 80 kilograms of pure heroin, was estimated as having a street value in New York of more than $131,000,000. When news of the seizure and arrests reached Molina-Chacon in New York, he fled to Spain with his family, leaving Risatti in charge of the shoe business.

During 1984, in an effort to infiltrate the drug ring, undercover federal Drug Enforcement Administration (DEA) agents, posing as drug dealers interested in obtaining large quantities of heroin, contacted Melania Lopez, the New York-based girlfriend of Molina-Chacon. Lopez eventually agreed to introduce the agents to Molina-Chacon. The agents travelled to Spain, met with Molina-Chacon and discussed the possibility of obtaining large amounts of heroin. In addition, they discussed helping Molina-Chacon to smuggle $20,000,000 in drug profits he claimed to have left behind in the United States. Molina-Chacon told the agents that his connections were Sicilian-based and that there were stockpiles of heroin and a heroin laboratory in the hills of Sicily. He boasted that, at the height of their operation, the organization was importing eighty kilos of pure heroin every fifteen days. Although he acknowledged that shipments ceased temporarily following the Italian drug bust, Molina-Chacon claimed that was the only eighty kilo shipment they had ever lost.

For several months, DEA agents recorded their conversations with Molina-Chacon. At one point, Molina-Chacon attempted to solicit the agents' help to collect the $1,000,000 debt Castelbuono owed the drug organization. Various options were considered, including killing both Castelbuono and Silvetti or simply injuring Castelbuono to persuade him to repay the amount.

In March 1985, undercover agents lured Molina-Chacon to Bermuda under the pretext of arranging a meeting with a "banker" who could launder the $20,000,000 cash Molina-Chacon claimed was still in the United States. During a tape-recorded conversation, Molina-Chacon and the DEA agents discussed future drug deals and the smuggling of drug profits from the United States. At the end of the conversation, agents arrested Molina-Chacon. He later waived extradition to the United States to stand trial. Subsequently, Francis DiTommaso, Rudolfo Risatti and Sheila Silvetti were arrested and indicted on various charges stemming from their participation in the drug smuggling and money laundering operations.

The four appellants, Molina-Chacon, Risatti, Silvetti and DiTommaso were tried together before a jury, and convicted.[4] We consider their appeals *seriatim*.

### I. *Victoriano Molina-Chacon*

Following the jury trial, Victoriano Molina-Chacon was convicted of conspiracy to import heroin (in violation of 21 U.S.C. § 952(a) (1970) (amended 1984)) and conspiracy to violate the federal currency reporting requirements (31 U.S.C. §§ 5313 and 5322(b) (1982)). Urging this court to overturn his convictions, Molina-Chacon asserts the following claims of error:

1. Molina-Chacon was denied his right to a speedy trial and therefore the indictment must be dismissed.

2. The court's erroneous "conscious avoidance" charge permitted the jury to convict Molina-Chacon without proof of the requisite conspiracy elements of knowledge and intent.[5]

3. Evidence of other uncharged conspiracies prejudiced Molina-Chacon, denying him a fair trial.

4. The court erred in forcing Molina-Chacon to be tried on charges other than those contemplated in the extradition proceedings.

5. The use of impermissibly suggestive identification procedures denied Molina-Chacon a fair trial.

---

**4.** Salvatore Messina was tried together with them but was acquitted.

**5.** This argument, also advanced by co-defendants Risatti and Silvetti, is treated *infra* under Section III–D.

6. The sentence imposed upon Molina-Chacon was illegal and suggestive.

For the reasons given *infra,* we hold these contentions unpersuasive and affirm Molina-Chacon's convictions.

### A. *Speedy Trial*

█ Molina-Chacon, detained without bail since his arrest on March 3, 1985, was indicted on March 20, 1985. On October 7, 1985, he moved for dismissal of his indictment under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1982 ed. and Supp. II). By order dated December 3, 1985, the District Court denied Molina-Chacon's motion and granted a Government motion for an adjournment of the trial date. *United States v. Molina-Chacon,* 625 F.Supp. 338, 343 (E.D.N.Y.1985). Trial commenced on February 10, 1986.

The Speedy Trial Act, as amended in 1979 and 1984, requires that a defendant be tried within 70 days of the later of either the filing of an indictment or information, or the first appearance before a judge or magistrate. 18 U.S.C. § 3161(c)(1); *Henderson v. United States,* __ U.S __, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). However, in computing the running of this 70–day period, the Act permits certain periods of time to be excluded. The District Court's opinion sets forth four independent grounds for excluding time from Molina-Chacon's speedy trial calculation.[6] Although a subsequent Supreme Court decision, *Henderson v. United States,* —— U.S. ——, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986), reveals that the District Court erred in its calculations, the error was harmless.

Guided by *Henderson,* our own speedy trial calculation follows.

Molina-Chacon first appeared before a magistrate on March 12, 1985. Therefore, in normal circumstances, his later indictment on March 20, 1985 would have triggered the running of his speedy trial clock. 18 U.S.C. § 3161(c)(1). In fact, under § 3161(h)(7), Molina-Chacon's speedy trial clock would not ordinarily begin to run until May 9, 1985, the date his codefendant, Salvatore Messina, first appeared for arraignment.[7] By that time, however, Molina-Chacon had already filed, on April 1, 1985, pre-trial motions requiring hearings. Under § 3161(h)(1)(F) any period of delay caused by any pretrial motion, from the filing of the motion through the conclusion of the hearing, is excluded.[8] *Henderson,* 106 S.Ct. at 1874. In addition, subsection (F) also excludes time after a hearing on a motion but before the district court receives all the submissions by counsel it needs to decide the motion. *Id.* at 1877. Finally, § 3161(h)(1)(J) permits the exclusion of an additional 30 days once the motion is actually taken "under advisement" by the court. *Id.* at 1876.

On the facts of this case, it is clear that Molina-Chacon's trial preceded the expiration of the span of his speedy trial "allowance." His final post-hearing brief was due on December 10, 1985. After allowing the district court 30 days to take the motion under advisement, Molina-Chacon's speedy trial clock started to run on January 10, 1986. Exactly one month later, on February 10, 1986, Molina-Chacon's trial be-

---

6. For a complete recitation of the facts behind the trial schedule in this case, see *United States v. Molina-Chacon,* 625 F.Supp. at 338–42 (E.D.N.Y.1985).

7. Section 3161(h)(7) mandates the exclusion of "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." As we have said, Messina, charged with conspiracy to import heroin and conspiracy to violate the federal currency reporting requirements, was ultimately acquitted.

8. 18 U.S.C. § 3161(h)(1)(F) is set forth below.

(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence: (1) *Any period of delay* resulting from other proceedings concerning the defendant, including but not limited to—

&ast; &ast; &ast; &ast; &ast; &ast;

(F) *delay resulting from any pretrial motion,* from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion; (emphasis added).

gan, well before the expiration of the statutorily mandated 70–day period.[9]

■ Molina-Chacon argues that under *United States v. Cobb*, 697 F.2d 38, 44 (2d Cir.1982), only that time which is "reasonably necessary for a fair processing of the motion[s]" should be excluded from the speedy trial calculations. The decision in *Cobb* has been eviscerated by *Henderson.* In *Henderson*, the Supreme Court, after considering the *Cobb* opinion, expressly declined to read into subsection (F) a "reasonably necessary" qualification. *Henderson*, 106 S.Ct. at 1876. To the contrary, the Court specifically held that Congress intended subsection (F) to exclude from the Speedy Trial Act's 70–day limitation all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is "reasonably necessary." *Id.*

■ We note that the trial court identified two additional, independent grounds for tolling the speedy trial clock. First, on the Government's motion, the court found that the case qualified as a "complex" case under § 3161(h)(8)(B)(ii). *United States v. Molina-Chacon*, 625 F.Supp. 338 (E.D.N.Y. 1985). We agree that this multi-defendant, international drug smuggling and money-laundering case was sufficiently complex to warrant excludable time. Not only were hundreds of reels of tapes in Spanish, English and Italian offered into evidence, but witnesses were scattered throughout Switzerland, Italy, Spain, Bermuda, Canada and the United States.

■ Second, the trial court ruled that under this court's Speedy Trial Guidelines, the Government was entitled to a seven week suspension of the running of the speedy trial clock due to the ill health of the chief prosecutor. We find no abuse of discretion in the trial judge's tolling of the clock to enable new assistant prosecutors to prepare for trial. We pause only to note that such a suspension is equally defensible under § 3161(h)(8)(A) which allows for exclusion of time to satisfy the "ends of justice." [10] We add, summarily, that there is nothing of record to support the appellant's charge that there was a plan or plot by the Government to delay the trial.

## B. *Evidence of Uncharged Conspiracies*

Molina-Chacon urges that he was prejudiced by evidence of conspiracies with which he was not charged. In particular, he claims that there were at least four separate conspiracies of which he was not a part: (1) the October 1982 receipt of 15 kilos of heroin by his partners Turano and Guiffrida; (2) the seizure by Italian officials of 80 kilos of heroin destined for his shoe store in January 1983; (3) a conspiracy to launder money; and (4) a conspiracy to supply undercover agents with large quantities of heroin which resulted in his arrest in March 1985.

■ It is the law of this circuit that a variance between a single conspiracy that

9. According to the trial court's calculations, Molina-Chacon's speedy trial clock did not commence to run until *January 9*, 1986 and expired on February 18, 1986, *40* days later. This determination reflects two errors, both of which favor the defendant and neither of which affects the disposition of this appeal. As such, we hold them harmless. First, as noted above, final submissions on Molina-Chacon's motion were due on December 10, 1985. *Henderson* suggests that the 30–day "advisement" period should be calculated exclusive of this due date. 106 S.Ct. at 1877. Thus, the 30–day advisement period began on December 11 and expired on January 9. The following day, January 10, is the proper trigger date for purposes of the Speedy Trial Act.

Second, the district court failed to exclude the 30–day advisement period from its calculations. *See Henderson*, 106 S.Ct. at 1877. Consequently, the speedy trial clock would not expire until 70 days (inclusive of the trigger date) had elapsed, not 40 days as the court held. By our calculations, then, the final date the Government could legally bring Molina-Chacon to trial would have been March 20, 1986.

10. 18 U.S.C. § 3161(h)(8)(A) provides in pertinent part for the exclusion of any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

has been charged and several conspiracies proved at trial mandates reversal only upon a showing of substantial prejudice. *United States v. Cambindo Valencia*, 609 F.2d 603, 622 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). Moreover, a proper jury instruction on the possibility of multiple conspiracies can eliminate the likelihood of prejudice. *Id.; see also United States v. Tramunti*, 513 F.2d 1087, 1107–08 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

■ Fatal to defendant's assertion of substantial prejudice in this regard is the fact that he requested, received, and failed to object to a jury instruction on multiple conspiracies. The court's instruction was consistent with *Cambindo Valencia* and *Tramunti* and therefore proper.[11] In addition, the sufficiency of the jury instruction is not open to attack by defendant on this appeal. By not objecting to the charge when given, and in the absence of plain error, counsel waived Molina-Chacon's claim of error with respect to the jury instruction. *United States v. Roglieri*, 700 F.2d 883, 888 (2d Cir.1983).

### C. *Extradition and the Speciality Doctrine*

On January 21, 1985, a warrant issued for Molina-Chacon's arrest based on a complaint charging him with conspiracy to import heroin into the United States on or about January 23, 1983. Subsequently, on March 3, 1985, he was arrested in Bermuda pursuant to an international provisional arrest warrant. This warrant, dated March 1, 1985, recited that Molina-Chacon was "alleged to be accused of the offense of conspiring to import heroin into the United States...." Although this later-issued warrant noted that the offense charged therein was "an extraditable offense," it left unspecified the time-frame of the conspiracy.

Following his arrest and while in the custody of the Bermuda police, Molina-Chacon executed a written waiver of his rights under the Extradition Act of 1870, consenting to return to the United States "to be tried for the offence [*sic*] of knowingly and intentionally conspiring to import into the United States from Italy approximately 80 kilograms of heroin ... on or about the 22nd day of January, 1983 ... in violation of Section 963, Title 21...." The next day, March 12, 1985, Molina-Chacon appeared before a magistrate in the Eastern District of New York to face arraignment. On March 20, 1985, the grand jury returned an indictment against Molina-Chacon, charging him with conspiracy to import heroin into the United States from October 1982 through March 4, 1985, both dates being approximate and inclusive. A superseding indictment, which added numerous defendants and expanded the conspiratorial time-frame to late 1981 through March 5, 1985 (both dates approximate and inclusive), was returned on April 3, 1985. Soon thereafter, on May 8, 1985, the grand jury voted a second superseding indictment. This indictment added a second count (conspiracy to violate and to aid and abet the violation of various currency reporting requirements) to the original count (conspiracy to import and to aid and abet the importation of heroin into the United States). Both counts covered the same time-frame: late 1981 through March 5, 1985.[12]

■ Relying on the doctrine of speciality, Molina-Chacon moved to dismiss the

---

11. The trial court charged the jury that "whether there was one conspiracy or two conspiracies, or a greater number of conspiracies or no conspiracies at all, is a fact for you to determine...." Tr. at 6668. The court further instructed the jury that

> [i]f you find that a particular defendant is a member of another conspiracy, not either of the ones charged in the indictment, you must acquit the defendant.
> In other words, to find a defendant guilty you must find he was a member of the conspiracy

charged in the indictment and not some other conspiracy.
Tr. at 6669.

12. Ultimately, Molina-Chacon was tried on a third superseding indictment, filed September 11, 1985. That indictment, however, merely added defendant Silvetti and the charge against her and made no additional allegations against Molina-Chacon.

second superseding indictment. He argued that the indictment contained counts which alleged additional charges and a broader conspiracy than that for which he consented to be returned to the United States. *Molina-Chacon,* 627 F.Supp. 1253, 1263 (E.D.N.Y.1986). According to Molina-Chacon, under *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), a defendant may not be tried for a crime other than the offense for which he was extradited. *Id.* Extrapolating from *Rauscher,* he urged that he was subject to prosecution only for the offense explicitly referred to in his extradition waiver, i.e., conspiring to import 80 kilos of heroin into the United States, on or about January 22, 1983. The District Court denied Molina-Chacon's motion and characterized his arguments as "totally without merit."

There are several reasons why appellant's contention was rightly rejected. As the District Court correctly observed, subsequent decisions have narrowly construed the doctrine of speciality by limiting *Rauscher's* holding to cases involving a formal extradition pursuant to treaty. *See, e.g., United States v. Valot,* 625 F.2d 308, 310 (9th Cir.1980). The simple fact is that Molina-Chacon was not extradited; he voluntarily waived his right to extradition and was deported by Bermuda. Moreover, the particular drug smuggling conspiracy specifically averred to in the extradition waiver form was an integral part of the larger conspiracies for which Molina-Chacon was ultimately convicted. *See United States v. Rossi,* 545 F.2d 814, 815 (2d Cir.1976) (per curiam), *cert. denied,* 430 U.S. 907, 597 S.Ct. 1178, 51 L.Ed.2d 584 (1977). Also, where, as here, the accused, having been deported, is properly within the court's jurisdiction, it has been said that the court should not consider the scope of the charges unless the Department of State or the deporting country suggests that the

defendant can or should be tried in the United States only for specified offenses. *Shapiro v. Ferrandina,* 478 F.2d 894, 908 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973).[13]

Nor does 18 U.S.C. § 3192 (1948) assist the defendant here. That provision, in relevant part, merely guarantees that the President of the United States shall take all necessary measures for the transportation and safekeeping of an accused person who is delivered by a foreign government to be "tried for any offense of which he is *duly accused* ... until the final conclusion of his trial for the offenses specified in the *warrant of extradition....*" (Emphasis added.) No warrant of extradition issued in this case. Consequently, the sole limitation arguably placed by this statute on Molina-Chacon's prosecution is that he face trial only for offenses of which he is "duly accused." As noted *supra,* in due course Molina-Chacon was properly accused of crimes specified in counts one and two of the second superseding indictment.

Finally, the trial court's finding that Molina-Chacon waived his right to extradition is amply supported by substantial evidence of record. His late-blooming assertion that he merely waived the *pro forma* procedures attendant to extradition and not his right to be extradited belies the unequivocal language of the extradition waiver.[14]

### D. *Evidence of Prior Identifications*

As part of its case-in-chief against Molina-Chacon, the Government called as a witness Franklin Liu, a convicted heroin smuggler. Liu testified that he attended a meeting in February 1982, with Molina-Chacon present, during which approximately $600,-000 was counted in furtherance of the mon-

---

**13.** We need not and therefore do not reach the separate issue of whether an extradited defendant is ever entitled derivatively to raise whatever objections the extraditing country might have. *Cf. United States v. Najohn,* 785 F.2d 1420, 1422 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986).

**14.** The form signed by the defendant was titled "WAIVER AND CONSENT" and recited as follows: "I, VICTORIANO MOLINA CHACON, having been charged with an extradition crime within the jurisdiction of the United States of America, hereby freely and voluntarily waive and forego *all my rights under the Extradition Act of 1870....*" (Emphasis added.)

ey-laundering conspiracy (Count 2). Liu was unable at trial to identify Molina-Chacon.[15] Nonetheless, following a hearing, the trial court admitted into evidence testimony by Liu of two previous photographic identifications he had made of Molina-Chacon. The defendant claims that by admitting this testimony into evidence the court committed reversible error. We disagree.

Under the Federal Rules of Evidence, evidence of a prior identification is generally admissible. Fed.R.Evid. 801(d)(1)(C). The Constitution requires the exclusion of such a prior identification only if it is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Molina-Chacon's point is that the first identification, made during a deposition taken in Italy by Italian prosecutors, was unnecessarily suggestive and therefore inadmissible.[16]

Even if we agree *arguendo* that this prior identification was "unnecessarily suggestive," our inquiry is not at an end. This court has stated that "[i]f the procedure is found to have been unnecessarily suggestive, the issue becomes whether the identification possesses sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). The determination of "sufficient reliability" in turn depends upon the totality of circumstances in each case. *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968).

▇▇▇▇ We are at liberty to reverse the trial court's ruling on the admissibility of the prior identification only if we find it to be "clearly erroneous." *United States v. Damsky*, 740 F.2d 134, 140 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984). Here, the court determined that, notwithstanding the suggestive nature of the Italian identification procedure, it was attended by sufficient indicia of reliability. First, the court observed that Liu consistently selected Molina-Chacon's photo from two different photo books on three separate occasions. Tr. at 347, 567. Second, the court was impressed by the certainty of Liu's identification and the accurate description he furnished of the defendant. Tr. at 352–54, 356. Finally, evidence elicited from the hearing showed that Liu observed the defendant for a half-hour during the February 1982 meeting (Tr. at 549) as well as on other occasions.

---

**15.** According to a subsequent witness, the defendant's appearance had changed dramatically during the year since his arrest.

**16.** During the deposition, the Italian prosecutor invited Mr. Liu to review a photo album and indicate those individuals he recognized. Their colloquy follows.

Liu: On page fifteen on the top pictures the number one person I think I have met him but I don't know his name. That's number one. Page fifteen this is—
Q: Where do you think—where did you think you saw him?
Liu: It was in New York.
Q: When and with whom?
Liu: Of course with them. In his office, in Mr. Turano's office.
Q: And who is he with? Who was this man with when you saw him?
Liu: Well, Mr.—of course with Mr. Turano.
Q: And with someone else?
Liu: In his office, in Turano's office but I'm not sure whether he's working there or he come to visit or who, who he is. I don't know. He look familiar to me, that's all.
Q: This man is Vittoriano Molina and Mr. Woo has indicated that this was the man who came with Mr. Turano to bring the money to his house when you were present?
Liu: That the one you said, that Antonio, Mr. Turano and his brother and one person went to Mr. Woo's house; is that the one?
Q: Yes.
Liu: Then yes, then I saw him in Mr. Woo's house also I saw him in Mr. Turano's office. That's why I'm familiar. Number two is Mr. Gaetano. Number three is Mr. Antonio Turano. The middle one, or middle picture, number two is Mr. Antonio Turano and I don't know the rest.
The bottom picture I only recognize number one, Mr. Antonio Turano and number three, Mr. Gaetano.
Q: Did you want to add something?
Liu: Oh, I just wanted to say that now I remember that the person who went to Mr. Woo's house together with Mr. Turano's brother.
Q: So you recognize this person in the—is the person we told you was Vittoriano Molina?
Liu: Yes.

Tr. at 558. *See also, Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). In these circumstances, we cannot find that the trial court's ruling was clearly erroneous.[17]

### E. *Legality of Sentence*

As noted above, Molina-Chacon was convicted of two separate conspiracies under two separate statutes: conspiracy to import heroin (Count 1) (21 U.S.C. § 952(a) (1970) (amended 1984)) and conspiracy to violate the federal currency reporting requirements (Count 2) (31 U.S.C. §§ 5313 and 5322(b) (1982)). The court imposed a 20–year prison sentence and a $250,000 fine on the first count and a consecutive 5–year prison term and a $500,000 fine on the second count.

■ Without citing any statutory support or judicial precedent, Molina-Chacon contends that the second conspiracy is actually a lesser included offense of the first and that therefore his second sentence should not have been imposed to run consecutively. However, the short answer is provided by *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), which makes clear that a single agreement to achieve two unlawful objectives, where each objective violates a different statute, gives rise to separate conspiracies and may be punished by consecutive sentences without offending the Double Jeopardy Clause of the Fifth Amendment. Thus, the Supreme Court in *Albernaz* upheld consecutive sentences for a single agreement both to import illegal narcotics and to distribute them, because each objective was made illegal by a separate statute. That principle blankets Molina-Chacon's case.

■ In sentencing Molina-Chacon on the heroin count to 20 years imprisonment,

the trial court imposed the maximum sentence allowable under 21 U.S.C. § 960 (1970) (amended 1984). The longest sentence permitted under that statute, prior to its amendment on October 12, 1984, was 15 years. The defendant asserts that the record showed no substantive narcotics violations after the date of the 1984 amendment and that therefore he should have been subjected to a maximum sentence of only 15 years. The evidence rebuts that position. On the very day of his arrest in March 1985, Molina-Chacon met with undercover agents posing as drug dealers and discussed further heroin deals and money-laundering activities. Clearly, the jury could find that the defendant was involved in the heroin conspiracy up until the moment of his arrest.

### II. *Rudolfo Risatti*

After the trial, the jury found Rudolfo Risatti guilty of conspiracy to import heroin into the United States (in violation of 21 U.S.C. §§ 963 (1970) and 960(b)(1)(A) (1984)) and conspiracy to defraud the United States Treasury Department, Internal Revenue Service, and Customs Service (in violation of 18 U.S.C. § 371 (1948)). On this appeal, he asserts that (1) he was deprived of his Sixth Amendment right to effective assistance of counsel; (2) the evidence was legally insufficient to support the jury's verdict and was tainted by improperly admitted hearsay; and (3) that the sentence imposed was excessive.[18] Seeing no merit in these contentions, we affirm.

### A. *Ineffective Assistance of Counsel*

■ According to Risatti, his trial counsel's performance fell "drastically below accepted limits of professional competence," prejudiced his defense and resulted in the denial of his Sixth Amendment right

---

17. Even if the court's admission of the prior identification testimony was clearly erroneous, we are not convinced that the error was harmful. Molina-Chacon's role as a principal in the multi-million dollar heroin importation and distribution ring was confirmed by overwhelming evidence.

18. Risatti also claims that the trial court deprived him of a fair trial by giving an erroneous jury instruction on "conscious avoidance" which he alleges enabled the jury to convict him without proof of the requisite conspiracy elements of knowledge and intent. This theory, also pressed upon us by co-defendants Molina-Chacon and Silvetti, is discussed *infra* in Section III–D.

to effective assistance of counsel. The benchmark for judging any such claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 684–87, 104 S.Ct. 2052, 2062–64, 80 L.Ed.2d 674 (1984). Risatti's appellate counsel correctly notes that this court is bound by the *Strickland* requirement of a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Wise v. Smith*, 735 F.2d 735, 737 (2d Cir.1984). To meet this strict test, appellate counsel has identified a number of alleged "unprofessional errors" committed by trial counsel. Risatti's position appears to be that, but for these so-called errors, the jury and the trial court would not have convicted him.

■ Risatti's first claim of error is the failure of trial counsel to move to suppress his post-arrest statement.[19] However, defense counsel is not required automatically to file a suppression motion in every case involving a post-arrest statement. *See United States v. Aulet*, 618 F.2d 182, 187 (2d Cir.1980). It is sufficient that counsel exercised "professional discretion in deciding whether there are sufficient grounds" to file a motion. *LiPuma v. Comm'r, Dep't of Corrections*, 560 F.2d 84, 93 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977). We are understandably reluctant to require defense counsel routinely to file boilerplate motions merely to vindicate their professional competence without regard for the grounds supporting such motions. Apart from the bald assertion that a suppression motion in this case would have "apparent viability," no basis for supporting this motion has been given us. In these circumstances, we are unable to conclude that

Risatti's trial counsel abused his discretion in deciding not to file a motion to suppress.

■ Similarly, we cannot fault trial counsel's decision not to move for a severance. Counsel rationally could have determined that his client's best interests would be served by emphasizing the contrast between the quantum of evidence presented against Risatti's co-defendants and that which directly reflected against Risatti himself. We will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed. *See United States v. Helgesen*, 669 F.2d 69, 72 (2d Cir.), *cert. denied*, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982).

■ Nor are we troubled by trial counsel's failure to argue for admission of exculpatory portions of Risatti's post-arrest statement which his co-defendant Molina-Chacon had successfully moved to redact. That statement, viewed in its entirety, contained not only a denial that Risatti counted drug profits, but also an admission that Risatti, along with Molina-Chacon, met Castelbuono on two occasions. Because of its tendency to inculpate Molina-Chacon, the statement was properly redacted under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Risatti's trial counsel should not be gigged for recognizing that rule or the trial perils of demanding that part of the redacted material should be reinserted.

■ Risatti also asserts that his original counsel failed to investigate and prepare for trial. However, in his post-trial motions, Risatti's present counsel openly acknowledges that trial counsel filed requests for and received certain discovery materials. That present counsel would have conducted more vigorous pre-trial discovery does not establish the ineffectiveness of trial counsel, and we have no other basis for so deciding.

■ Risatti also complains that his attorney actually slept through portions of

---

**19.** According to uncontroverted testimony elicited at trial, Risatti was read his *Miranda* rights following his arrest and acknowledged that he understood those rights prior to making any statement. The statement Risatti now says should have been suppressed consists, in redacted form, of Risatti's admission that he helped carry boxes which he thought contained cash from Turano's shoe store to Castelbuono's office.

the trial. Although sleeping counsel is tantamount to no counsel at all, *Javor v. United States,* 724 F.2d 831, 833–34 (9th Cir. 1984), the record is barren of any factual support for this allegation.[20] Without proper support in the record before us, we are unable on direct appeal to entertain this serious accusation.[21]

We have reviewed at length transcripts of trial counsel's cross-examination and summation. To put it charitably, neither performance furnishes a full model for aspiring advocates.[22] On the other hand, we have not discovered any error of constitutional dimension. As the Court noted in *Strickland,* "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. at 2065. We are simply unable to conclude that Risatti's trial counsel's conduct fell outside the "wide range of reasonable professional assistance." *Id.*

 Unlike his co-counsel, Risatti's attorney did not exercise the option afforded by the trial court for an extension of time within which to submit post-trial motions. Instead, immediately following the conclusion of the trial, Risatti's counsel orally moved the court to set aside the verdict or grant a new trial under Rules 29 and 33, Fed.R.Crim.P. This election represented a reasonable tactical decision of trial counsel which we will not disturb on appeal. Present counsel's attempt to revive these motions in the guise of a claim of ineffective assistance suffers from the defects specified in the trial court's memorandum and order dated July 10, 1986. *United States v. Risatti,* 638 F.Supp. 300 (E.D.N.Y.1986).

### B. *Sufficiency of the Evidence*

 Risatti claims that the evidence presented against him, even when viewed in the light most favorable to the Government, is insufficient to support the jury's verdict. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Brawer,* 482 F.2d 117, 125 (2d Cir.1973).

The evidence tended to show that Risatti's involvement in the drug ring went far beyond passive association with drug traffickers and unwitting attendance during drug-related transactions. Following the arrests of Guiffrida and Turano on heroin importation charges, Risatti signed the latter's bail bond application. There was testimony that Risatti helped count $2.2 million in cash which he delivered to Castelbuono. Further evidence established both the precarious financial condition of the multi-national shoe business and the fact that in 1982 Risatti claimed a mere $2000 in adjusted gross income from his job as chief shoe salesman. There were intercepted conversations referring to "Rudy," including a statement by Molina-Chacon that he relied on "Rudy" to keep him informed about the money-laundering activities. From these facts, a jury could conclude beyond a reasonable doubt that Risatti knew the cash profits he helped count were generated not by shoe sales but by heroin sales.

Construing all permissible inferences in favor of the Government, as we must, we find the verdict to be well supported by substantial evidence in the record. *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Moreover, we have examined and rejected Risatti's allegation that prejudicial hearsay deprived him of a fair trial.

### C. *Legality of Sentence*

The District Court sentenced Risatti to a 15–year prison term on Count 1 (conspiracy

---

**20.** Risatti's present counsel did attempt to expand the record to support a "sleeping counsel" theory by filing an affidavit in support of a Rule 33 motion. This affidavit asserted, upon information and belief, that Risatti's trial counsel "took numerous cat naps" throughout the trial.

**21.** Risatti remains free, of course, to raise this issue by filing an appropriate motion under 28 U.S.C. § 2255 (1948) collaterally attacking his sentence.

**22.** However, parts of the cross-examination of witness Lopez seem to have been effective.

to import heroin). On Count 2 (conspiracy to defraud the United States), the court imposed a concurrent 5–year sentence. In addition, Risatti was fined $20,000. Risatti's contention that this sentence is excessive and violates the Eighth Amendment prohibition against cruel and unusual punishment is weightless.

The Government's recommendation that Risatti receive a 10–year prison term does not render the imposition of a longer sentence excessive, cruel or unusual. Indeed, Risatti's convictions subjected him to a maximum sentence of 20 years on Count 1 and 5 years (to be served consecutively) on Count 2, in addition to $750,000 in fines. When a defendant's sentence falls within the statutory range, it will not be set aside on appeal absent extraordinary circumstances not present here. *See, e.g., United States v. Ortiz,* 742 F.2d 712 (2d Cir.), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 573, 83 L.Ed.2d 513 (1984); *see also United States v. Bonnet,* 769 F.2d 68, 71 (2d Cir.1985).

### III. *Sheila Silvetti*

The jury returned a guilty verdict against Sheila Silvetti on Count 2 of the indictment (conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1948)).[23] She raises several challenges to her conviction.

### A. *Exclusion of Allegedly Exculpatory Evidence*

Silvetti's principal argument is that the court erred in refusing to allow evidence which tended to show that her asserted participation in the conspiracy after February 1983 (when Castelbuono first initiated contact with the DEA), including the preparation of certain incriminating documents, was in furtherance of her and Castelbuono's cooperation with Government agents. To that end, she sought to introduce the testimony of Government agents as to their contacts with Castelbuono in order to establish her theory that, simply because she knew the nature and extent of their contacts with Castelbuono, she therefore believed that she and Castelbuono were acting legally and with Government approval.

Several flaws undermine Silvetti's position. First, she failed to make a proffer of useful evidence (evidence showing that federal agents would testify that *she* was cooperating or had prepared documents in connection with that cooperation), which in any event could have related only to the post-February 1983 period. Second, the independent evidence established that the bulk of the incriminating documents she prepared antedated Castelbuono's initial contact (in February 1983) with the DEA. Third, although the court made no formal ruling, the evidence was properly excludable under Fed.R.Evid. 403 on the grounds of confusion, prejudice, undue delay and waste of time—which would all result from testimony relating to contacts between federal agents and Castelbuono (not Silvetti). Finding no clear abuse of the court's broad discretion, we will not disturb its ruling. *United States v. Medico,* 557 F.2d 309, 317 (2d Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977).

---

**23.** Silvetti's entree into this convoluted conspiracy arose from her status as Anthony Castelbuono's secretary, administrative assistant and concubine. As noted above, during a money-laundering trip to Atlantic City in November 1982, Anthony Castelbuono managed to squander one million dollars in illegal heroin profits. Predictably, Castelbuono's bad luck did not end at the gaming tables. In late 1982 and early 1983, Molina-Chacon and his confederates visited Castelbuono on three separate occasions to discuss his failure to deposit the money into a previously-designated Swiss account. Various repayment plans were discussed during these meetings, and privately Molina-Chacon considered having Castelbuono killed. Sensing the gravity of his predicament and doubtlessly motivated by the powerful instinct of self-preservation, Castelbuono sought out a Drug Enforcement Administration (DEA) agent in February, 1983. Ultimately, on November 21, 1983, he signed a limited cooperation agreement with the Government which entitled him to use and derivative-use immunity for information which he provided. In return, the Government's representative agreed to provide Castelbuono with protection, but reserved the right to prosecute him at their own discretion. Castelbuono's trial was severed from that of the other defendants.

### B. *Jury Instruction on Specific Intent*

■■■ Silvetti's conspiracy conviction under Count 2 of the indictment [24] "cannot be sustained unless the Government establishe[d] beyond a reasonable doubt that [Silvetti] had the specific intent to violate the substantive statute." *United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir.), *cert. denied*, 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). Moreover, a conviction of violating the reporting requirements of Title 31 requires proof of both a defendant's knowledge of the reporting requirement and her willful failure to report. *See, e.g., United States v. Dichne*, 612 F.2d 632, 636 (2d Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). Notwithstanding Silvetti's assertion that the jury was misinstructed, we are unable to identify harmful error in the trial court's jury instructions regarding specific intent. True, the pertinent instruction did not in terms refer to the particular currency statutes alleged to have been violated. However, it did make reference to "knowingly and intentionally concealing information relating to currency transactions that is required by law to be disclosed." [25] In addition, the trial judge charged that, in order to convict Silvetti of conspiracy, the Government had to prove that she "willfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy." Moreover, considered as a whole, the instructions are replete with references to "willfullness" and "knowing" and "intentional" participation. The jury was adequately charged on the requisite *mens rea*.

### C. *Sufficiency of the Evidence*

■■■ Silvetti's attack on the sufficiency of the evidence is likewise unavailing. Evidence adduced at trial tended to show her knowing participation in both stages of the money-laundering operation. At the gaming tables in Atlantic City, she helped to convert small dirty bills to larger denominations (usually $100 bills) so that the money could be more easily concealed when transported. Then, in her role as international courier, she helped smuggle the freshly laundered drug profits out of the country for eventual deposit into foreign bank accounts. In 1982 she prepared and hid incriminating documents connected with the conspiracies. Thus, substantial evidence supports the jury's verdict which therefore must be sustained. *United States v. Young*, 745 F.2d 733, 762 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

### D. *Jointly Asserted Error: "Conscious Avoidance" Instruction*

■■■ As one ground for reversing their convictions, Molina-Chacon, Risatti and Silvetti contend that the trial court erred in instructing the jury that it is no defense to a charge of conspiracy to violate the narcotics laws that the defendant consciously avoided learning that the substances involved were actually narcotics.[26]

To dispose of Silvetti's claim we need note only that, because she was never charged with violating the narcotics laws, her reliance on this asserted error is misplaced. With respect to Molina-Chacon and Risatti, "there are two aspects of knowledge involved in a conspiracy: (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Heinemann*, 801 F.2d 86, 93 (2d Cir.1986) *cert. denied*, —— U.S. ——, 107 S.Ct. 1308, 94 L.Ed.2d

**24.** The conspiracy charged in Count 2 alleged four objectives: (1) to defraud or attempt to defraud the United States Treasury Department; (2) to violate or aid and abet the violation of 31 U.S.C. § 5313 (1982); (3) to violate or aid and abet the violation of 31 U.S.C. § 5314 (1982); and (4) to violate or aid and abet the violation of 31 U.S.C. § 5316 (1982) (amended 1984).

**25.** In connection with the substantive charges related to currency transactions, the court charged that "the Government must also establish beyond a reasonable doubt that the defendant knew of the currency transaction report requirement and that he acted with the specific intent to commit the crime."

**26.** Under the "conscious avoidance" doctrine, a defendant's affirmative efforts to "see no evil" and "hear no evil" do not somehow magically invest him with the ability to "do no evil."

163 (1987). Although a "conscious avoidance" charge is improper with regard to the first aspect, that theory is entirely appropriate with regard to the issue of "guilty knowledge." *Id.; see also, United States v. Jacobs,* 475 F.2d 270, 287–88 (2d Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 131, 38 L.Ed.2d 53 (1973). Here, both Molina-Chacon and Risatti asserted ignorance of the specific objectives alleged in the indictment—accordingly, a "conscious avoidance" instruction was fitting. *Heinemann,* 801 F.2d at 94. Moreover, the trial court specifically limited its instruction to avoidance of the knowledge of the particular nature of the controlled substance involved in the conspiracy and not to the existence of the conspiracy itself.[27]

## IV. *Francis DiTommaso*

Although found not guilty of the conspiracy to import heroin alleged in Count 1, Francis DiTommaso was convicted of the money-laundering conspiracy and two substantive offenses alleged in Count 2. On appeal, he argues (1) that he was deprived of his Sixth Amendment right to the assistance of counsel of his choice; (2) that the trial court's prejudicial conduct denied him his right to a fair trial; and (3) that the sentence imposed violated the Double Jeopardy Clause of the Fifth Amendment.

### A. *Sixth Amendment Right to Counsel*

▮ DiTommaso's Sixth Amendment claim is premised on his assertion that the trial court abused its discretion in disqualifying Lawrence S. Goldman, DiTommaso's original attorney, two months before the trial was scheduled to begin. According to

DiTommaso, this disqualification deprived him of the counsel of his choice. Although of constitutional dimension, a criminal defendant's right freely to choose his counsel is not absolute and must give way when required by the fair and proper administration of justice. *See, e.g., United States v. James,* 708 F.2d 40, 44–45 (2d Cir.1983); *United States v. Ostrer,* 597 F.2d 337, 341 (2d Cir.1979). In this circuit, an attorney may be disqualified from representing a client in a particular case if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues of the present law suit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983).

▮ Here, co-defendant Messina (*see* fn. 4, *supra* ), after extensive consultation with the trial court, moved to disqualify Goldman because of his previous representation of Messina in a separate case which also involved drug conspiracy charges. Anthony Castelbuono, a central figure in the current case, had referred Messina to Goldman, had testified on Messina's behalf in the earlier case, and had himself represented Messina in certain business transactions and litigation.[28] Goldman's representation of Messina apparently ended sometime in 1981, approximately two years be-

---

27. Molina-Chacon and Silvetti argue that the "conscious avoidance" part of the instruction, though related by the court only to the narcotics conspiracy, could well have been carried over by the jury to the money-laundering conspiracy. The answer is that (a) the instruction on the money-laundering charge was itself unexceptable and correct, (b) there is nothing in the instructions to induce the jury to apply the "conscious avoidance" theory to money-laundering, and (c) in its context, the prosecutor's summation did not suggest or induce any such carry-over.

Molina-Chacon also attacks the court's instruction that the Government must prove "that

a defendant was aware *of the high probability* that the substance that was involved in the conspiracy was a controlled substance" (emphasis added) but deliberately refused to learn the facts. This particular language did not reduce the Government's burden of proof but was to appellant's advantage; it was recently upheld in *United States v. Gatzonis,* 805 F.2d 72, 73–74 (2d Cir.1986).

28. Among his many other talents, Castelbuono was a practicing attorney, having graduated from Harvard Law School.

**220**

fore DiTommaso engaged him in this case. While representing Messina on drug charges, Goldman was likely to have had access to privileged information potentially relevant to the present case. *Cf. Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 574–75 (2d Cir.1973). Messina remained a defendant until he was acquitted. In these circumstances it was reasonable for the trial judge to rule as he did, to avoid the prospect of a conflict of interest which potentially could confer an unfair advantage on DiTommaso, *James,* 708 F.2d 40, 45 (2d Cir.1983) or adversely affect Messina's interests. *Ostrer,* 597 F.2d 337, 340 (2d Cir.1979). Goldman's disqualification satisfies the standards set forth in *Artek Systems,* 715 F.2d at 788, and was a permissible exercise of judicial discretion.[29]

## B. *The Trial Court's Conduct*

DiTommaso argues that the trial court's rulings, remarks, conduct and demeanor tipped the scales against him and "made a mockery of [his] right to a fair trial." This alleged judicial misconduct, he claims, entitles him to reversal. Each of DiTommaso's complaints about Judge Platt's conduct falls into one of three general categories: (1) abuse and disparagement of counsel; (2) display of favoritism towards the prosecution; and (3) character assassination of DiTommaso and his character witnesses. Our examination of these complaints is made more onerous by the fact that our review is necessarily limited to "the cold black and white of a printed record." *United States v. Grunberger,* 431 F.2d 1062, 1067 (2d Cir.1970). Thus, for example, comments allegedly "dripping with sarcasm" when made during trial often forfeit their acrimonious tone when excerpted for inclusion in appellate briefs and appendices. Nonetheless, the inquiry remains whether Judge Platt's conduct was so prejudicial that it denied DiTommaso a fair, as opposed to a perfect, trial. *United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985); *United States v. Robinson,* 635 F.2d 981,

984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981).

### 1. *Abuse and Disparagement of Counsel*

■ According to DiTommaso, Judge Platt abused and disparaged his trial attorney in the presence of the jury on three separate occasions. At one point, when counsel's cross-examination of a Government agent lapsed into a leading question, the court characterized the attorney's improper attempt to testify as a "cheap shot." Another time, the court interrupted counsel's questioning of a witness to clarify a legal point in order to prevent the jury, in the court's terms, from being "sidetracked." Finally, when counsel complained that he was denied access to a certain document, the court reminded counsel that the Government was "under no obligation to prepare your case for you." We are mindful that because of the judge's unique position, the jury is likely to accord great weight to even his most casual remarks. Nonetheless, reversal is not mandated where, as here, rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was being handled. *United States v. Ross,* 321 F.2d 61, 66 n. 3 (2d Cir.), *cert. denied,* 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). Also, Judge Platt mitigated the sting of his remarks by specifically instructing the jury "not [to] hold any admonition I make to attorneys against his or her client. The clients are not involved in my dealings with the attorneys."

■ Outside the jury's presence, Judge Platt repeatedly demonstrated irritation and impatience with counsel. The judge warned counsel that he considered it "dirty pool" to attempt to create the impression before the jury that the Government was improperly withholding certain documentary evidence.

Later, on DiTommaso's motion, the court ordered the Government to redact a doc-

**29.** *United States v. Diozzi,* 807 F.2d 10 (1st Cir. 1986)—cited by DiTommaso—was quite different in that the First Circuit decided that there were acceptable methods of obtaining the same

evidence other than by calling the attorney as a witness. Here, there were no workable methods of screening off Goldman's possible prior knowledge.

ument prepared by co-defendant Silvetti which indicated that DiTommaso was present in Atlantic City during a money-laundering trip. In redacted form, the document was purged of all references to DiTommaso and his wife. The court warned counsel that he should not argue that the redaction was evidence that DiTommaso was not present in Atlantic City stating, "If you make that argument your head is going to spin."

On another occasion, counsel contested the relevance of an offer of proof by the Government and complained that the inference sought to be drawn from the evidence did not logically follow. The court retorted, "Your mind doesn't work that way. The normal mind does work that way."

█ Although we tend to agree that the trial court's conduct toward counsel left much to be desired,[30] we are not inclined to reverse this case on that ground. Even if unwarranted, a judge's reprimand of counsel furnishes no basis for reversal if made outside of the jury's presence. *United States v. Capaldo*, 402 F.2d 821, 825 (2d Cir.1968), *cert. denied*, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969); *see United States v. DiPaolo*, 804 F.2d 225, 232 (2d Cir.1986). The untoward remarks made in the jury's presence were minor.

### 2. *Display of Favoritism*

█ We do not accept the argument that the trial judge usurped the prosecutorial function by questioning DiTommaso and a Government witness. The trial court's participation in litigation is not restricted to that of a mere umpire or referee. Because the court has a responsibility to see that issues are clearly presented to the jury, his limited questioning of witnesses is entirely appropriate. *United States v. Vega*, 589 F.2d 1147, 1152 (2d Cir.1978). Here, Judge Platt's questions were directed primarily to the clarification of testimony and did not betray the court's belief as to the defendant's guilt or innocence. Moreover, to prevent the jury from

misconstruing the court's questioning, Judge Platt properly instructed the jury that his questioning should not be interpreted to reflect his opinion of the guilt or innocence of any defendant. *See United States v. Newman*, 481 F.2d 222, 223–24 (2d Cir.), *cert. denied*, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973).

### 3. *Impeachment of Character Witnesses*

█ Defense counsel led a parade of witnesses through the courtroom to testify concerning their opinion that DiTommaso was a law-abiding citizen. To impeach their testimony, the Government, during cross-examination, elicited from DiTommaso the fact that none of the character witnesses was aware of his involvement with cocaine as a user and supplier to Anthony Castelbuono. This line of questioning, for the limited purpose of impeachment, was appropriate under Fed.R.Evid. 608(b).

In sum, although DiTommaso may not have received a perfect trial, he did receive a fair one. *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985).

### C. *Legality of Sentence*

█ The jury found DiTommaso guilty of failure to file a Currency Transaction Report (in violation of 31 U.S.C. § 5313 (1982)) and failure to file a Report of International Transportation of Currency or Monetary Instruments (in violation of 31 U.S.C. § 5316 (1982) (amended 1984)). Under § 5322(b) of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5322(b) (1982), each violation was enhanced to felony status because done willfully and "while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period." As enhanced, each violation carried a maximum penalty of a $500,000 fine, 5 years of imprisonment, or both.

The Government recommended that DiTommaso receive a 5–year prison term.

---

**30.** For another recent case in which this judge's conduct toward lawyers was challenged, *see United States v. DiPaolo*, 804 F.2d 225, 230–33 (2d Cir.1986). It is unfortunate that this court has had to deal so frequently with this type of claim on appeal.

**222**

Nonetheless, the court sentenced him to 5–year terms for each Currency Act violation, to be served consecutively. Thus, Di-Tommaso received an aggregate prison sentence of 10 years.[31] Contrary to defendant's assertion, imposition of cumulative sentences, in the circumstances of this case, violated neither the Currency Act nor the Double Jeopardy Clause of the Fifth Amendment. Under DiTommaso's reading of the statute, all Currency Act violations occurring during a twelve-month period would be aggregated into a single felony, a result we consider wholly unwarranted. Further, the statute converts to felonies violations committed *"as part of* a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period." 31 U.S.C. § 5322(b) (emphasis added). DiTommaso's interpretation would render superfluous the phrase "as part of." Appellant's reading is also unsupported by the legislative history. *See United States v. Kattan-Kassin,* 696 F.2d 893 (11th Cir. 1983); *United States v. So,* 755 F.2d 1350, 1355 (9th Cir.1985).

In a word, DiTommaso was convicted of two separate Currency Act violations involving different transactions. Because this case does not involve multiple punishments for the same offense, we conclude that the consecutive 5–year terms were lawful, permitted by Congress, and pose no constitutional problems. *Cf. North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

## CONCLUSION

The result is that the convictions and sentences of the four appellants are all

AFFIRMED.

---

**31.** DiTommaso also received a 5–year suspended sentence on the conspiracy conviction and was assessed fines totaling $16,000.