**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 22 2017

for CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on June 22, 2017

for **SUSAN L. CARLSON**
**SUPREME COURT CLERK**

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) ) | No. 92816-9 |
| SIONE P. LUI, | ) ) | |
| Petitioner. | ) ) ) | En Banc |
| | ) ) ) | Filed JUN 2 2 2017 |
| | ) | |

GONZÁLEZ, J.—Petitioner Sione P. Lui challenges his conviction for the second degree murder of his fiancée, Elaina Boussiacos.[1] He seeks a new trial based on allegations of ineffective assistance of counsel, prosecutorial misconduct, *Brady*[2] nondisclosure, jury misconduct, and newly discovered evidence. The Court of Appeals dismissed each claim as meritless and denied Lui's request for a reference hearing. We affirm.

---

[1] This is Lui's second time challenging his murder conviction before this court. His direct appeal raised an unrelated issue about whether a state expert may testify regarding tests performed by a nontestifying lab technician without violating the defendant's confrontation rights under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). *State v. Lui*, 179 Wn.2d 457, 315 P.3d 493 (2014).

[2] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

FACTUAL AND PROCEDURAL HISTORY

Lui and Boussiacos began dating in 1999 and were engaged to be married by the following summer with no set date for their nuptial. The couple moved into a duplex in Woodinville, Washington, in early 2001. A month later, Boussiacos's body was discovered stuffed in the trunk of her car approximately one mile from the couple's Woodinville home. Her murder remained unsolved for several years until police detectives reexamined her case file and conducted further DNA (deoxyribonucleic acid) testing in 2006. Lui was eventually charged with and convicted for her murder in 2008.

The State's theory was that Lui killed Boussiacos after he learned she was leaving him. A few days before her disappearance, Boussiacos discovered Lui had been secretly communicating with a former girlfriend with whom he had previously had an affair. On Wednesday, January 31, Boussiacos confronted Lui about his deception. That same day, she informed a witness that the wedding was off, the relationship was over, and either she or Lui would be moving out of their home. Boussiacos closed the couple's joint banking account the next afternoon[3] and reaffirmed, albeit less resolutely, the following Friday that she was "probably" going to break up

---

[3] Lui disputes the significance of this closure since the checking account was overdrawn.

with Lui and was looking forward to being single again, 5 Report of Proceedings (RP) at 539. Boussiacos was last seen alive that Friday evening.

Boussiacos was scheduled to travel to California the next morning, Saturday, February 3, 2001, at 8:30 a.m. to visit her mother, but she never boarded the plane. The last call made from Boussiacos's cell phone was at 7:04 a.m. to check her flight status. Her luggage and car were not at home, but the confirmation ticket for her rental car reservation in California was there.

Police found Boussiacos's body six days later, on Friday, February 9, 2001, stuffed in the trunk of her car in the parking lot of the nearby Woodinville Athletic Club (WAC) approximately one mile from her home. Her death was caused by asphyxia due to neck compression.

When police officers discovered her body, Boussiacos was wearing a white T-shirt, black sweat pants, and sneakers. By all accounts, Boussiacos wore only sweat pants and T-shirts to bed. Boussiacos was not wearing a bra, though a bra was wadded up and stuffed between her breasts. Her socks were twisted and pulled up too high, and her left shoelace was tied askew as if someone else had dressed her. Forensic testing of the shoelaces revealed DNA belonging to three male bloodlines. One bloodline belonged to either

Lui or his son from a prior marriage. The second bloodline belonged to either Boussiacos's ex-husband, James Negron, or the son she shared with him. The identity of the third bloodline was unknown.

Boussiacos's suitcase and travel bag[4] were found with her in the car. At trial, the State focused on the unusual way Boussiacos's travel bag was packed and missing typical travel items, which suggested, according to the State, that someone else probably packed it for her in haste. Notably, even though Boussiacos typically wore makeup when she went out in public, her makeup bag was not in either her suitcase or travel bag. Instead, loose in her travel bag were a hairbrush, deodorant, a hairdryer, a nearly empty bottle of hair gel, a second uncapped bottle of hair gel, an uncapped bottle of liquid makeup foundation, a compact of bronze makeup powder, a large bottle of lotion, a large bottle of nail polish remover, and several makeup brushes. There was no toothbrush or nail polish. In contrast, her suitcase was very neatly packed. It contained folded clothes, sandals, black boots, tennis shoes, and a small bottle of lotion.

Despite the prolonged police investigation, the detectives suspected Lui early on. They suspected that he probably strangled Boussiacos at

---

[4] Lui debates whether this bag was Boussiacos's travel bag or merely her gym bag, but he never objected to the State's characterization of the bag as a "travel bag" at trial. 7 RP at 895. We refer to the bag as it was described to the jury.

home, finished packing for her, stuffed her body in the trunk of her car, drove the car to the WAC, abandoned it there, and walked home. To corroborate their theory, the detectives hired a scent-detection specialist to locate Lui's scent at the WAC. The scent tracking occurred on February 14, 2001—11 days after Boussiacos's car was first spotted at the WAC. The dog traced Lui's scent from the car directly to his home.

Lui, however, was not charged with Boussiacos's murder until 2007. Lui maintained his innocence at trial and was represented by defense attorney Anthony Savage. At trial, Savage criticized the detectives for being so determined in their pursuit to convict Lui that they failed to test obvious articles of Boussiacos's clothing for DNA and ignored all exculpatory DNA and fingerprint evidence they did obtain. Savage got the State's experts to admit that there were nine fingerprints lifted from Boussiacos's car, none of which belonged to Lui, that there was DNA belonging to an unknown male on the gearshift skirt of her car, as well as DNA belonging to an unknown male on her shoelaces, and that there was sperm possibly belonging to an unknown male inside Boussiacos's vagina. Savage even got the detectives to admit there was an earlier murder in Woodinville involving a female victim a few weeks prior to Boussiacos's disappearance and that they never considered the possibility that these two murders might have been linked.

To refute the scent track evidence, Savage argued it was nearly impossible for the State's dog to track an 11-day-old scent trail left by Boussiacos's assailant when he or she abandoned the car at the WAC. Instead, Savage explained it was more likely that the dog was tracking the scent trail left by Lui eight days earlier when he and his friend Senisi Taumoefolau were at the WAC distributing missing person flyers to nearby businesses.

After five hours of deliberations, the jury convicted Lui of second degree murder. Lui timely filed this personal restraint petition,[5] claiming he is entitled to a new trial, or at least a reference hearing, because (1) Savage provided ineffective assistance, (2) the State failed to disclose internal police disciplinary records in violation of *Brady*, (3) the jury improperly considered extrinsic evidence, and (4) the parties acquired newly discovered DNA evidence. The Court of Appeals denied each claim. *In re Pers. Restraint of Lui*, No. 72478-9-I (Wash. Ct. App. Jan. 19, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/724789.pdf. Lui sought review in this court, which we granted. *In re Pers. Restraint of Lui*, 186 Wn.2d 1008, 380 P.3d 504 (2016). We now affirm.

---

[5] Lui filed this personal restraint petition simultaneously with his appeal. Review of Lui's personal restraint petition was stayed pending resolution of his appeal, which concluded in 2014. *Lui v. Washington*, 134 S. Ct. 2842, 189 L. Ed. 2d 810 (2014) (denying certiorari review).

ANALYSIS

I. *Ineffective Assistance of Counsel and Related Prosecutorial Misconduct Claims*

Lui contends his trial attorney, Savage, was ineffective because he (a) was inattentive at trial, (b) failed to prepare Taumoefolau for trial, (c) failed to hire a scent track expert for the defense to rebut the State's expert, (d) failed to elicit testimony establishing a later date for when Boussiacos's car appeared at the WAC, (e) failed to impeach lead detective Denny Gulla about his lengthy disciplinary history, (f) failed to argue Boussiacos's ex-husband was a possible suspect, (g) failed to present evidence that Lui was physically incapable of manually strangling Boussiacos with his right arm due to an earlier injury, (h) failed to object when the detectives commented on Lui's veracity, (i) failed to object when the prosecutor suggested that Lui may have strangled Boussiacos during the course of a sexual assault, (j) failed to object when the detectives and the prosecutor described Lui's reaction to Boussiacos's disappearance and murder as inconsistent with an innocent, grieving partner, and (k) failed to object when the prosecutor asked questions about Lui's religion.[6] Lui also raises separate but related

_____

[6] Lui originally listed counsel's failure to obtain independent DNA testing as a possible ground for ineffective assistance, Pers. Restraint Pet. at 47, but is no longer pursuing that claim. Wash. Supreme Ct. Oral Argument (Feb. 2, 2017), *available at*

7

prosecutorial misconduct claims based on the detectives' testimony, the prosecutor's questions regarding Lui's Mormon faith, and the prosecutor's suggestion during closing that Lui may have sexually assaulted Boussiacos during the course of the murder.

We review ineffective assistance of counsel claims de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009) (citing *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001)). We apply the same prejudice standard to ineffective assistance claims brought in a personal restraint petition as we do on appeal. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012) ("[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice."). To prevail, Lui must prove counsel's performance fell below an objective standard of reasonableness in light of all the circumstances and that in the absence of counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104, 131

---

www.tvw.org/watch/?eventID=2017021009, at 44:20-45:08; *see* Suppl. to Pers. Restraint Pet. at 2.

S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). In other words, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

To combat the biases of hindsight, our scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011); *Strickland*, 466 U.S. at 689. To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance. *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (alteration in original) (quoting *Strickland*, 466 U.S. at 690-91).

For Lui to prevail as a personal restraint petitioner on his stand-alone

prosecutorial misconduct claims, he must prove the alleged misconduct was either a constitutional error that resulted in actual and substantial prejudice or a fundamental defect that resulted in a complete miscarriage of justice. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 676-77, 327 P.3d 660 (2014). Additionally, because Lui did not object to the misconduct at trial, his claim is considered waived unless the misconduct is "'so flagrant and ill-intentioned that it caused an enduring and resulting prejudice that could not have been neutralized by a curative instruction.'" *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 143, 385 P.3d 135 (2016) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

## A. Defense Counsel's Health and Attentiveness at Trial

Lui contends that Savage was inattentive during trial. He alleges that Savage dozed off at times, was forgetful, and suffered from a knee injury that caused him to deteriorate mentally and physically. Pers. Restraint Pet. at 8-9. Lui submits several declarations from trial attendees who question whether Savage was fully alert during trial. App. to Pers. Restraint Pet. at 29 (Decl. of Sione Lui for Pers. Restraint Pet.) ("He dozed off several times."), 34 (Decl. of Grant Mattson) ("Mr. Savage did not look particularly alert at many points during the trial."), 35 (Decl. of William Harris) ("Anthony Savage did not seem to be very alert during the trial.").

Allegations of sleeping counsel and mental unfitness are serious, and if proved, may support a finding of deficient performance. *In re Pers. Restraint of Caldellis*, 187 Wn.2d at 145 n.6 (listing cases where counsel was found deficient for having fallen asleep during critical portions of trial); *State v. Abercrombie*, No. 60603-4-I, noted at 151 Wn. App. 1052, 2009 WL 2595007, at *4 ("'[S]leeping counsel is tantamount to no counsel at all.'" (quoting *United States v. DiTommaso*, 817 F.2d 201, 216 (2d Cir. 1987))).

To prevail on an ineffective assistance claim, however, a defendant must prove more than deficient performance; he must prove prejudice. *In re Pers. Restraint of Caldellis*, 187 Wn.2d at 144-45. Lui fails to specify how he was harmed by counsel's alleged sleeping. He does not cite to any particular moment when counsel was alleged to have been sleeping. Nor do we observe any signs that counsel was sleeping or otherwise inattentive in the record to form a basis for evaluating prejudice.

The record shows the trial judge was acutely observant of the courtroom and cautious of possible grounds for ineffective assistance claims. Twice the trial judge cited jurors for perceived inattentiveness. 5 RP at 442 (juror's use of electronic device); 9 RP at 1277 (juror's head was down and his eyes appeared closed). At no time, however, did the judge ever indicate that defense counsel was sleeping or otherwise inattentive. To the contrary,

the record demonstrates that Savage, as the only attorney present on Lui's behalf, remained engaged throughout trial. Savage made numerous evidentiary objections during the State's case in chief based on relevancy, hearsay, the confrontation clause, and evidence preservation. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *e.g.*, 5 RP at 434-38; 6 RP at 643-50, 761-62; 7 RP at 869-77; 8 RP at 932-33, 953, 975-81, 1034; 9 RP at 1177-81, 1200-07, 1243-45; 10 RP at 1344-47, 1352, 1336-72. He also conducted several strategically timed voir dires of the State's witnesses during direct examination in attempt to undermine the strength of their anticipated testimony. *See, e.g.*, 6 RP at 773-81; 7 RP at 859, 884-85, 894, 896, 916, 984-85; 9 RP at 1188, 1252-53, 1306; 10 RP at 1353, 1358; 12 RP at 1489, 1494-95, 1512-13, 1588-89. Savage even reminded the judge at one point that the judge had failed to provide a final ruling on an earlier matter. 9 RP at 1207; 12 RP at 1481. He also reminded the State that it could not discuss certain pieces of evidence because that evidence had not yet been admitted. 6 RP at 762; 8 RP at 985-86.

Although Savage did suffer a fall during trial, the trial judge quickly noted the injury on the record and provided counsel a one-day recess, which with the weekend amounted to four days off, to recover and avoid any potential claims of ineffective assistance. 11 RP at 1466, 1469-71. After the

recess, the trial judge appeared to have no further concern about Savage's health other than with his inability to stand and walk, for which he was excused. 12 RP at 1476, 1562.

In the absence of prejudice, Lui is not entitled to relief. Nor is he entitled to a reference hearing to determine whether counsel was actually sleeping. To obtain a reference hearing, Lui must raise disputed material facts that, if proved, would establish prejudice sufficient to entitle him to relief. *In re Pers. Restraint of Caldellis*, 187 Wn.2d at 146; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). Lui fails to prove prejudice meriting a reference hearing.

### B. The Path Lui Took While Distributing Flyers

At trial, the State argued the scent trail tracked by its scent-detection specialist's dog was left by Lui 11 days earlier when he walked home after dumping Boussiacos's body and car at the WAC parking lot. Lui admitted to having been in the area but explained he was there 8 days earlier distributing missing person flyers and that the trail tracked by the dog largely coincided with the path he and his friend Taumoefolau took while distributing those flyers. Because Lui did not testify at trial, Savage relied on Taumoefolau to explain the complicated route they took. Lui is displeased, however, with the quality of Taumoefolau's trial testimony. He

argues, and Taumoefolau agrees, that had Savage prepared Taumoefolau better before trial and provided him with a more comprehensive map of the area, Taumoefolau would have been able to explain better the two loops he and Lui took.

According to Taumoefolau, he and Lui started from Lui's home, walked west past a 7-Eleven convenience store and a farm supply store, and then turned north to stop at a Kinko's printing store to order more flyers. App. to Pers. Restraint Pet. at 41 (Taumoefolau Decl.). While their order was processing, they resumed west toward a Mexican restaurant. After that, they headed northeast to a fire station, but then cut south through the WAC parking lot toward Kinko's to pick up their order. After picking up their order, they continued on a northeastern path toward a Top Foods grocery store, an AT&T telecommunication store, and a Barnes & Noble bookstore. From there, they continued southeast toward Lui's home, cutting through a nearby Park & Ride parking lot along their way. Taumoefolau complains this route was difficult to describe during trial because the map Savage provided depicted only a portion of that route. Notably, the Kinko's, the Mexican restaurant, and the fire station were not pictured on the map.

Regardless of whether Taumoefolau's testimony could have been clearer about the path he and Lui took, their exact route was not critical to

Lui's defense. The purpose of Taumoefolau's testimony was to undermine the significance of the State's scent track evidence by explaining that he and Lui had been in the area passing out flyers and testifying that the scent tracked by the dog coincided with the path they took. Taumoefolau provided clear testimony on that point. He testified that on Tuesday, February 6, 2001, he and Lui walked on foot from Lui's home to nearby businesses, including the WAC, to distribute flyers and that they walked the same path as the path tracked by the dog on their way home. The map utilized at trial covered the significant portions of that path related to the scent track and sufficiently aided Taumoefolau in his effort to explain how their path coincided with the scent track. Lui was therefore not prejudiced by counsel's failure to prepare Taumoefolau or use a more comprehensive map.

Although the State mentioned during closing that the path Taumoefolau described did not make sense, the State was not criticizing the testimony as incomprehensible. 14 RP at 1841. Instead, the State argued the testimony defied common sense. To find Taumoefolau's testimony credible, the State explained, the jury would have to believe that the scent trail followed by the State's dog was left by Lui when he was passing out flyers and yet Lui somehow failed to pass out any flyers to the many

businesses located along the path, including those businesses at a busy Target shopping center. Taumoefolau's posttrial declaration does not refute this; he does not say that he and Lui stopped at Target to pass out flyers. Thus, a more comprehensive map or additional pretrial preparation would not have helped.

Counsel also did not act unreasonably in choosing not to elicit testimony from Lui's sister and others who would have testified that Lui had passed out flyers near the WAC. Again, contrary to Lui's evaluation of trial, the debate at trial was never over whether Lui had passed out flyers in the area. The State specifically conceded in its opening statement that Lui had distributed flyers throughout the neighborhood and city during the days following Boussiacos's disappearance. Instead, the debate centered on whether the dog tracked Lui's path while he was passing out flyers around the WAC or, as the State alleged, the path he took home after he disposed of Boussiacos's car and body at the WAC. The proffered testimony from Lui's sister and friends was irrelevant to that debate.

### C. State's Scent Track Evidence

Lui further asserts Savage was ineffective for failing to exclude the State's scent track evidence and failing to introduce a scent-detection expert to counter the State's evidence. At trial, the State argued that its scent-

16

detection dog was able to track the path Lui took 11 days earlier after he abandoned Boussiacos's car and body at the WAC and walked home. Savage sought to discredit this testimony by getting the State's expert to admit it was unlikely his dog could even track an 11-day-old scent trail left by Boussiacos's assailant and to admit it was more likely the dog was tracking the path Lui took while distributing flyers since that path was only 8 days old.

The State's expert testified, however, that it did not matter that Lui had been in the area passing out flyers closer in time to the dog's scent tracking because his dog could distinguish among scents left by the same person on different days. 8 RP at 1100-07. The expert explained that his dog was following the scent that matched the age of the scent on the clothes the police collected from Lui's home, which the jury was left to assume was worn about the same time as Boussiacos's disappearance since no evidence was admitted regarding when Lui wore those clothes.

Lui contends Savage should have hired a scent tracking expert for the defense to discredit the State's expert testimony that its dog could discern among scent particles left by the same person on different days. But "'[g]enerally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate

trial tactics.'" *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 171, 288 P.3d 1140 (2012) (plurality opinion) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004)).

Savage's cross-examination of the State's expert reveals he had a plan to discredit the State's scent track evidence without the use of a defense expert. The State's expert, however, provided surprise testimony regarding his dog's extremely sensitive olfactory senses. While testimony from an expert for the defense certainly could have been helpful to counter that surprise testimony, Lui has not shown counsel knew or should have known that the State's expert would so testify. He therefore fails to show Savage's strategy to discredit the State's scent track evidence through cross-examination alone was an unreasonable strategy.

Moreover, Lui fails to prove prejudice. Lui simply concludes it was critical to rebut the State's scent track evidence because one of the prosecutors described the evidence as "the best piece of evidence we have" during the early stages of the State's investigation. App. to Pers. Restraint Pet. at 105. Even without the scent track evidence, the reliability of which was strenuously debated at trial, the remainder of the State's evidence pointed to the murder occurring at Boussiacos's home after she had dressed for bed and before she had finished packing for her trip, and supported the

18

inference that her assailant had dressed her and finished packing for her.

There was no evidence that anyone other than Lui had access to the couple's home, since the couple had just moved into the home a month earlier and there were no signs of a break-in. *See* 8 RP at 998. Indeed, Lui confirmed that he and Boussiacos were home alone the entire night. 9 RP at 1322. He explained that they watched the news on television until he fell asleep on the couch at about 12 a.m., and that Boussiacos was gone by the time he woke at 7 a.m. the next morning. Lui's cell phone records, however, contradicted that timeline, documenting that Lui had called and later spoke with his sister at around 1:30 a.m. that morning. 7 RP at 811. His downstairs neighbor also testified that he heard footsteps upstairs at around 3:15 a.m., 5 RP at 583, 593, and that Lui inquired later that morning about the location of the light switch for their shared driveway, informing the neighbor that he was "going crazy" the night before trying to turn off that light, *id.* at 585.

Lui's related claim that Savage should have objected to the admission of the State's scent track evidence pursuant to *State v. Lord*, 161 Wn.2d 276, 294-96, 165 P.3d 1251 (2007), also fails. *Lord* is not analogous. In *Lord*, we held the trial court did not abuse its discretion in excluding a scent track expert on behalf of the defense because the expert could not narrow when,

within a two-week window, the scent trail was left by the victim. *Id.* at 294-95 & n.16. In *Lord*, it was undisputed that the victim had walked that same path numerous times during those two weeks. *Id.* at 295. The issue therefore was whether the dog tracked the victim's path on the day she disappeared, as the defense argued, or on an earlier date, as the State argued. *See id.* Without specifying a date, the expert's testimony was helpful to neither the State nor the defense, and we held the trial court did not abuse its discretion in excluding that evidence as a result. *Id.* We, however, specifically recognized that "*if* the dog handler had been able to determine that the scent track was from the date of the crime, such evidence might have been admissible and relevant." *Id.*

Unlike the victim in *Lord*, Lui walked the path tracked by the State's dog only once. The debate at trial centered on when and why he walked that path. Did he walk that path after he disposed of Boussiacos's car and body at the WAC, or did he walk that path when he was distributing flyers? The State argued the path Lui took was inconsistent with someone passing out flyers because of the irregular route taken and because Lui failed to pass out any flyers along that route. Thus, unlike the party proffering the scent track evidence in *Lord*, the State in this case could date the scent trail through other circumstantial evidence. Moreover, unlike the defense's expert in

20

*Lord*, the State's expert *did* testify, albeit to Savage's surprise, that his dog could distinguish between different trails left by the same person on different days and that the dog tracked the scent trail that matched the age on Lui's clothing. 8 RP at 1100-07. Given these critical differences, Lui has not proved the trial court was required to exclude the State's scent track evidence pursuant to *Lord* and consequently fails to prove he was prejudiced by counsel's failure to seek its exclusion.

Lui's assertion that Savage should have argued the State's dog was tracking Boussiacos's scent rather than his scent also fails. This claim is wholly without merit. Savage *did* question the State's expert about the possibility that Boussiacos's scent may have transferred onto Lui's clothing, resulting in the dog tracking her scent rather than his. *Id.* at 1085-87. The State's expert acknowledged that in some cases of sample contamination, there would be no way to rule out the possibility that the dog tracked a scent different from the intended scent, *id.* at 1086-87, but explained he could rule out Boussiacos as a possible scent source in this case because his dog could not track someone traveling in a car (or more specifically the trunk of a car). *Id.* at 1089. Since there was no evidence that Boussiacos had walked from her home to the WAC in the days prior to her death, it was reasonable for counsel to not pursue that theory any further.

It was similarly reasonable for Savage to not call a defense expert to explain the scent trail tracked by the dog through nearby bushes could not coincide completely with the actual trail taken by Lui because the State's expert conceded that point. The State's expert explained the path tracked by his dog was only an approximation of the route taken by Lui because the dog was following scent particles that had been blown and deposited by the wind along nearby street curbs and bushes. *Id.* at 1096. Any additional defense expert testimony would merely have been duplicative on this uncontroverted matter.

### D. The Date Boussiacos's Car Appeared in the WAC Parking Lot

Lui also disagrees with Savage's decision to accept the State's theory about when Boussiacos's car appeared in the WAC parking lot. The State theorized that Lui killed Boussiacos sometime between Friday night and Saturday morning and then abandoned her car at the WAC parking lot early that morning. Corroborating that timeline, the owner of the WAC testified that she first noticed Boussiacos's car in the parking lot that Saturday morning when she arrived to open the gym at 7:00 a.m. but waited six days to report it because she thought it may have belonged to one of her members. Another gym employee also testified that other employees said they had seen Boussiacos's car at the WAC that weekend. Lui disputes the accuracy

of these observations and argues his trial counsel was deficient for failing to elicit testimony from Taumoefolau and others about how they did not see Boussiacos's car in the WAC parking lot until later that week.

Lui fails to prove counsel's decision not to present that testimony was devoid of trial tactic or strategy. Evidence placing the vehicle's appearance at the WAC on a later date, closer in time to the scent tracking would have undermined the defense theory that the scent trail left by Boussiacos's assailant was too old to track. "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington*, 562 U.S. at 108. Counsel therefore reasonably chose not to present that testimony.

Moreover, even though Savage did not question Taumoefolau about when he saw Boussiacos's car in the WAC parking lot, Taumoefolau volunteered that information during cross-examination by the State. He testified that he was in the shopping area at least three times that week and did not see the vehicle at the WAC until the following Friday when the police discovered it. 14 RP at 1775-76.

### E. Officer Gulla's Disciplinary History

Lui insists Savage should have impeached Gulla's credibility with his lengthy disciplinary history. Prior to trial, the State moved to exclude

23

Gulla's disciplinary history as detailed in a 2005 *Seattle Post-Intelligencer* article. The article revealed Gulla had been under internal investigation numerous times for making sexual advances toward a minor in 1986, for tampering with a breathalyzer test in exchange for a date with a young woman in 1986, for striking and cursing at a hit-and-run suspect in 1988, for videotaping gang members assaulting other gang members rather than intervening to stop the assault in 1992, and for using his authority as an officer to intimidate and threaten his girlfriend's estranged husband in 2004.

Savage agreed not to introduce evidence of Gulla's disciplinary history at Lui's 2008 trial unless the State opened the door. He explained that he did not intend to present the evidence because the allegations made against Gulla in the article and in other unidentified cases had no nexus to Lui's case. Counsel's assessment was not unreasonable.

ER 608 permits impeachment of a witness through his or her character for truthfulness and untruthfulness. Although ER 608(b) allows impeachment through specific instances of misconduct, such conduct must be probative. Because the probative value of misconduct diminishes over time, ER 609(b) places a presumptive 10-year time limit on prior convictions. As indicated above, many of Gulla's infractions cited in the *Seattle Post-Intelligencer* article were over 10 years old by the time Lui

went to trial in 2008.[7] It was therefore not unreasonable for counsel to have conceded their exclusion. It was also not unreasonable for counsel to forgo impeaching Gulla with testimony he gave in 2001 in a different case since the court in that case could not determine whether Gulla's testimony was "intentionally misleading or just carelessly inaccurate." App. to Pers. Restraint Pet. at 451, 468.

Furthermore, even if evidence of Gulla's prior misdeeds were relevant and not too remote in time, Lui still fails to show how impeaching Gulla about his past transgressions would have altered the results in this case. "The need for cross-examination on misconduct diminishes with the significance of the witness in the state's case." *State v. Clark*, 143 Wn.2d 731, 766, 24 P.3d 1006 (2001). Contrary to Lui's contention, Gulla was not a decisive witness for the State. As previously discussed, the linchpin of the State's case was the way Boussiacos was dressed and how her travel bag was packed when the officers found her. Although Gulla was at the crime scene when Boussiacos's body was found, he was not alone and his testimony was corroborated by other officers who were present at the crime scene and the many photographs they took there.

---

[7] "The 10-year period starts at conviction or 'release from confinement for that conviction,' whichever is later. The 10-year period ends when the conviction is admitted at trial." *State v. Russell*, 104 Wn. App. 422, 432, 436 & n.27, 16 P.3d 664 (2001) (quoting H.R. REP. NO. 650, at 11 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7075, 7085).

The only evidence to which Gulla testified independently was the preservation of DNA evidence at the precinct and the seizure of clothing from Lui's home that was used as scent samples for tracking purposes. That testimony was not particularly helpful to the State's case. The strength of the DNA evidence was debatable since there were multiple male DNA sources on Boussiacos's shoelaces and vaginal wash. Even worse for the State, forensic testing of the bloodstain on Boussiacos's gearshift skirt and fingerprint analysis of the prints lifted from her car excluded Lui as a possible source for both. As for the scent track evidence, it was highly disputed at trial, with the State's expert even admitting that an 11-day-old scent fell within the outer limits for a reliable scent track.

F. Exclusion of Boussiacos's Ex-husband, Negron, as a Possible Suspect

Lui's defense theory at trial was that someone else killed Boussiacos. Lui asserts his trial counsel was deficient for not offering Boussiacos's ex-husband, Negron, as a possible suspect. DNA matching Negron's paternal bloodline was found on Boussiacos's shoelaces, and Negron knew Boussiacos would be heading to the airport the Saturday morning that she disappeared. Negron also had a hot temper and possible motive for killing Boussiacos because the two were involved in a custody and child support dispute over their son. Lui contends that dispute was especially significant

because custody and child support matters had been extremely hostile between Negron and Boussiacos in the past, resulting in Negron absconding with their son, moving to Washington, and forging Boussiacos's signature on dissolution and custody papers in 1994 and 1995. When questioned by the detectives, Negron confirmed that Boussiacos had mentioned that she wanted to change their parenting plan and child support arrangement but explained they were still in the informal discussion phase.

Prior to trial, the State moved to exclude evidence of Negron's alleged gang affiliation, evidence that he physically abused his son, and testimony from Boussiacos's former roommate about Negron's credibility. Savage conceded that such evidence was not relevant and informed the State that he did not intend to offer Negron as an alternative suspect. Lui contends there was no strategic or tactical purpose for this concession. In a posttrial declaration, Savage explains he did not offer Negron as an alternative suspect because he did not believe it was legally colorable under state law and because Negron was a church pastor, had an alibi corroborated by three people, and was not fighting with Boussiacos over custody of their son. Savage dismissed the presence of DNA matching Negron's bloodline on Boussiacos's shoelaces as probably belonging to Negron's son who shared

the same paternal DNA profile as him[8] and over whom Boussiacos shared custody.

"The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime" beyond mere speculation. *State v. Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014) (internal quotation marks omitted) (quoting *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932)). While motive alone may not be enough, *id.* at 379-80, Lui had more than motive. He had DNA evidence matching Negron's paternal bloodline on Boussiacos's shoelaces, which, according to the State's theory, had been tied by Boussiacos's assailant.

The decision to forgo otherwise permissible evidence does not, however, render counsel ineffective if the decision can be characterized as part of legitimate trial strategy. Here, counsel weighed the debatable importance of Negron's DNA on Boussiacos's shoelaces against the strength of his alibi, his reputation in the community as a church pastor, and the absence of any recent altercation between Negron and Boussiacos and decided not to pursue Negron as a possible other suspect. Savage explains

---

[8] Negron's son could not be excluded as a possible DNA source because the State performed Y-STR DNA testing on the shoelaces. The Y-STR test focuses on the short tandem repeats on the Y chromosome that are the same in all males with the same paternal lineage.

his trial strategy was to highlight deficiencies in the State's case rather than engage in a contest between theories for fear that it would reflect poorly on the defense in the event the jury disagreed with the defense theory that Negron was the true assailant. State's Resp. to Pers. Restraint Pet., App. C at 2-3.

The touchstone for ineffective assistance is not whether we agree with counsel's approach. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. In light of the unidentified DNA evidence found on Boussiacos's gearshift skirt, the unidentified fingerprints lifted from her car, the unidentified male DNA on her shoelaces, and the unidentified semen found in Boussiacos's vagina, it was not unreasonable for counsel to focus on that unidentified suspect or suspects rather than specifically target Negron, especially when Negron had an alibi, albeit not as strong as Savage believed,[9] and did not know where Boussiacos lived. App. to Pers. Restraint Pet. at 24 (explaining how Boussiacos kept her residential address a secret from Negron). Lui fails to overcome *Strickland*'s strong presumption of reasonableness.

---

[9] Although Savage noted that Negron had three alibi witnesses for Friday night, the record shows that his wife was the only person who could corroborate his whereabouts that Saturday morning.

G. <u>Lui's Arm Injury</u>

Next, Lui asserts Savage was deficient for failing to introduce evidence that Lui was physically incapable of manually strangling Boussiacos due to an arm injury. Lui fractured his right forearm playing rugby four months before Boussiacos's murder. He had six screws placed in his arm and wore a cast for several weeks. The cast was removed in mid-November over two months before Boussiacos's murder.

Before trial, the State requested Lui's medical records in anticipation of a possible medical defense. Savage acknowledged that Lui had an arm injury and that medical records corroborated it but informed the State that he would not be raising a medical defense. In his posttrial declaration, Savage explains that he did not present this evidence because he believed a medical defense was "tenuous, at best," given Lui's stature and athletic prowess, testimony from one witness that Lui was physically able to move a heavy dresser by himself despite the injury, and Lui's statement to the police that he had changed Boussiacos's flat car tire by himself the night before she disappeared. State's Resp. to Pers. Restraint Pet., App. C at 8-9.

Lui dismisses Savage's reservations as easily rebuttable by medical records. According to Lui, those records show that he was wearing a cast until mid-November and was still going to physical therapy in March

2001—a month after Boussiacos's disappearance. Lui's posttrial medical expert opines that based on Lui's physical therapy records, Lui could not have moved a dresser by himself in November or December 2000, as one witness testified, since muscle atrophy would have been at its worst during those initial weeks after his cast was removed. App. to Pers. Restraint Pet. at 201-02 (Becker Decl.).

While evidence that Lui had a weak right arm raises doubt about whether he could have manually strangled Boussiacos with that arm, it does not cast doubt on the State's theory that Lui strangled her with a ligature. The State's medical examiner identified "band" marks with "a linear quality" along one side of Boussiacos's neck that was consistent with strangulation by a cord or other ligature. 10 RP at 1386-90. The medical examiner also found finger marks on that same side of Boussiacos's neck that could have belonged to either her or her assailant. 10 RP at 1387-90. As a result, the medical examiner could not specify whether Boussiacos died by manual strangulation or strangulation with a ligature. *Id.* The State did, however, find Boussiacos's DNA under her nails, which supported the theory that a ligature was probably used and that Boussiacos tried to pry it loose during the struggle. 9 RP at 1218-19.

Lui presents no evidence showing that he was incapable of strangling

someone with a ligature. Lui's post-trial medical expert merely postulates that Boussiacos probably died of manual strangulation given the position of the fingermarks on her neck. His expert provides no explanation for the linear band marks; nor does he opine that Lui was incapable of strangling Boussiacos with a ligature. Thus, regardless of whether it was unreasonable for counsel to not present evidence of Lui's arm injury, Lui has failed to show a reasonable probability that this evidence would have altered the outcome of his case where the medical examiner concluded Boussiacos was strangled either manually or with a ligature.

### H. Police Testimony That Lui Was Lying

Lui contends Savage was deficient for failing to object when Detectives Christina Bartlett and Susan Peters testified that they believed Lui had lied during police interviews. Police officers are generally not permitted to testify about a defendant's veracity. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion) ("[N]o witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant."). But an officer may repeat statements made during interrogation accusing a defendant of lying if such testimony provides context for the interrogation. *Id.* at 763-64 (discussing *State v. O'Brien*, 857 S.W.2d 212, 221 (Mo. 1993), and *Dubria v. Smith*, 224 F.3d 995, 1001-02

(9th Cir. 2000)); *see also State v. Kirkman*, 159 Wn.2d 918, 931, 934, 155 P.3d 125 (2007).

Bartlett's testimony stayed mostly within this permissible boundary. Bartlett initially testified that she interviewed Lui in 2006 because she wanted him to explain the "lies" he told during earlier interviews, but she immediately clarified that she was referring to inconsistencies in the file, rather than actual lies told by Lui.[10]  10 RP at 1449-53. In contrast, Peters went too far. She testified that "the object of [the] interview was to get more information on specifics that had never been answered and [her] goal was to get the truth and a confession," and explained she "would have loved to have a confession, the truth." 14 RP at 1720. Together, Peters's statements implied a belief on the detective's part that Lui was guilty.

Nonetheless, Lui cannot prevail because he cannot prove defense counsel's failure to object to these statements was unreasonable. Counsel wanted Peters to testify that the goal of the interrogation was to obtain a confession from Lui. That testimony laid the foundation for his defense that

---

[10] Bartlett also testified that "[Lui] clearly did lie to me several times." 13 RP at 1675. Lui did not, however, challenge this statement. This statement probably exceeded the scope of permissible testimony, but the burden is on Lui to establish the facts for his claim of ineffective assistance. Even if Lui had listed this as a basis for ineffective assistance, he still cannot prevail because he cannot prove prejudice when his own counsel conceded during closing that Lui did lie to the police at least regarding the whereabouts of Boussiacos's engagement ring, which he claimed was in the possession of Boussiacos's mother, 10 RP at 1431, even though he had given it to his new wife. 14 RP at 1867.

33

the detectives targeted Lui early on as a suspect and manipulated him throughout their interrogation with lies about fictitious suspects and misrepresentations regarding the evidence in an effort to coerce him to confess to a murder he did not commit.

Lui's related but separate prosecutorial misconduct claim based on the detective's testimony fails as well. The disputed testimony was elicited by *defense* counsel, not the prosecutor, during cross-examination to support the defense theory that the detectives had fixated on Lui as a suspect, blatantly lied to him, and badgered him throughout hours of interrogation in a futile attempt to get him to confess to a crime he did not commit.

## I. Prosecutor's Inference of Sexual Assault

During closing, the prosecutor suggested that Lui may have strangled Boussiacos during the course of a sexual assault. Lui claims that the State overstepped the scope of closing arguments and that Savage was deficient for failing to object. Although prosecuting attorneys have wide latitude to argue facts and reasonable inferences from the evidence, *State v. Thorgerson*, 172 Wn.2d 438, 453, 258 P.3d 43 (2011), they are not permitted to make prejudicial statements unsupported by the record. *See State v. Rose*, 62 Wn.2d 309, 312-13, 382 P.2d 513 (1963) (improper to refer to defendant as "'drunken'" when every witness testified that he did not

appear drunk or intoxicated); *State v. Boehning*, 127 Wn. App. 511, 519-23, 111 P.3d 899 (2005) (cannot infer multiple instances of rape from unpursued rape charges because unpursued charges are not evidence).

Lui contends there were no facts to support the State's inference of sexual assault. Lui is wrong. DNA testing revealed Lui's semen on Boussiacos's panties and inside her vagina, revealing they recently had intercourse, 12 RP at 1540-43, even though Boussiacos had informed several people that their relationship was over, 5 RP at 394-95, 498-504, 531-45; 6 RP at 608-10, 713-14. When Boussiacos's body was discovered, she had bruises on her nose and face, and she was dressed strangely as if someone else had dressed her. 7 RP at 866-68; 10 RP at 1361-65, 1376. The medical examiner testified that he could neither confirm nor rule out the possibility that Boussiacos had been sexually assaulted. 10 RP at 1404-05. Drawing from this evidence, the prosecutor asked the jury to consider why Lui continued to deny having had sex with Boussiacos in the days prior to her death when DNA evidence proved that he did. 14 RP at 1828-29. The prosecutor suggested that perhaps something "very bad" happened that night, *id.* at 1828, and that "[m]aybe it happened at the same time she was being strangled, maybe not," *id.* at 1830. The prosecutor further theorized that given the small amount of sperm found in the vaginal wash, 9 RP at

1212, 1236, 1292-93, "[i]t is entirely possible that there was no completed sex act and that would have been the final humiliation for him." 14 RP at 1830. The prosecutor later confirmed her theories were just speculation: "Did he try to have sex with her, before he was strangling her, at the same time he was strangling [her], after he strangled her. We don't know." *Id.* at 1853.

The prosecutor's inference of sexual assault was supported by trial testimony and within the wide latitude given to attorneys during closing arguments. Lui's claim of ineffective assistance and his related claim of prosecutorial misconduct therefore fail.

### J. Comments on Lui's Guilt or Innocence

Lui further contends Savage was deficient for failing to object when the detectives and the prosecutor told the jury his reactions to Boussiacos's death did not align with the reactions of a "'grieving fiancé[ ]'" or an "'innocent man.'" Pers. Restraint Pet. at 43-45. Whether a defendant is innocent or guilty is a question solely for the jury. *State v. Todd*, 78 Wn.2d 362, 375, 474 P.2d 542 (1970). On the issue of bereavement, a witness may testify that a defendant showed no signs of grief so long as the conclusion is logically supported by personal observations and the witness does not attempt to testify as an expert on whether the defendant's reaction was that

36

of a truly bereaved person. *See State v. Stenson,* 132 Wn.2d 668, 721-24, 940 P.2d 1239 (1997).[11]

Peters testified that she and Bartlett presented "several questions to [Lui] that were lies that were test questions, to see how he would respond, being the grieving fianc[é]." 14 RP at 1720. She explained that "[they] were expecting, if it was a *true victim* . . . or someone [who] had a family member murdered, that the reasonable person to [her] would ask, 'who are those suspects? When are you going to arrest them?'" *Id.* at 1722 (emphasis added). She testified that Lui never asked any of those questions.

To prevail on his ineffective assistance claim, Lui must prove counsel acted unreasonably, without legitimate trial strategy or tactic, in failing to object to that testimony. Notably, defense counsel was the one who elicited

---

[11] *See Stenson,* 132 Wn.2d at 722 (paramedic permitted to testify that he was "surprised" to learn the defendant was the victim's spouse because he did not "show any grief"); *State v. Craven,* 69 Wn. App. 581, 586, 849 P.2d 681 (1993) (emergency room social worker permitted to testify the defendant's behavior was "unusual" when compared to the behavior of other family members she saw in the hospital); *State v. Day,* 51 Wn. App. 544, 552-53, 754 P.2d 1021 (1988) (permissible for officers to testify the defendant's reaction was "'inappropriate'" based on their observations that he had shown "'very little emotion,'" was "'unemotional,'" and did not ask any questions the officers expected he would); *State v. Allen,* 50 Wn. App. 412, 416-19, 749 P.2d 702 (1988) (police officer allowed to testify the defendant's sobbing "'did not look genuine or sincere'" based on "her facial expression, the lack of tears, [and] the lack of any redness in her face"). *But see State v. Sargent,* 40 Wn. App. 340, 349-51, 698 P.2d 598 (1985) (improper for detective to testify the defendant's reaction to his wife's death was "'contrived'" because it was based on an unfounded assumption that the defendant had already known his wife was dead); *State v. Haga,* 8 Wn. App. 481, 490-92, 507 P.2d 159 (1973) (ambulance driver not permitted to testify based on his 12 years of experience as a deputy coroner and ambulance driver that the defendant was "'very calm and cool,'" showed no signs of grief, and reacted "'unusual[ly]'" by not offering to assist).

the challenged testimony. Rather than object to this testimony, he used it to force Peters to admit that Lui's failure to inquire about the status of the State's investigation or the identities of the fictitious suspects was not evidence of guilt. *Id.* Thus, regardless of whether Peters's testimony fell outside the permissible scope of opinion testimony, Savage's decision to undercut the force of that testimony through cross-examination rather than an objection is not without legitimate trial strategy.

Moreover, counsel's decision not to object to Peters's testimony allowed him to respond effectively to Bartlett's otherwise permissible testimony. Bartlett never opined about Lui's guilt or innocence. Instead, she testified that when she interviewed Lui years after Boussiacos's murder, he never asked her about the status of the investigation or the identities of any suspects even though she had expected him to so inquire. 10 RP at 1437, 1453-54. Specifically, she testified that she misled Lui into believing the State had two suspects because she wanted to see if "he would ask about anybody who was a suspect in the death of his fianc[é]e or what their relationship was or questions that [she] thought he would, anybody would ask." *Id.* at 1437. She further explained that "very much like people who lose great people who are very important in their life," she believed "one of the common things that someone would say is, 'oh, I feel some sense of

38

relief, some sense of wanting to know what happened to the love of their life, who was involved, how it happened, how we got to this information and do expect some relief.'" *Id.* at 1453-54. In addition to not asking those questions, she added that Lui never appeared angry or upset and never questioned her about why the investigation was taking so long. *Id.* at 1437. Although Bartlett never specifically opined on the reactions of true victims, Savage was nevertheless able to rebut her testimony by getting Peters to admit later that Lui's failure to ask those questions or react in a certain way was not evidence of guilt.

Lui's related challenge regarding defense counsel's failure to object when the prosecutor suggested Lui's reaction was inconsistent with that of an "innocent man" also fails. During closing, the prosecutor explained:

> We know that an *innocent man* would have kicked and screamed over the length of this investigation and how long it took to solve.
>
> He would have screamed at the detectives the night that [s]he was found instead of saying, I have to go to her. I have to go to her, pounding on the table. He would have asked who did it, how did it happen?
>
> Where are your leads? What is going on? He would have wanted to know everything about the two new suspects that he was told about. He didn't ask once about anything like that.
>
> He would not have sat watching TV and dosing [sic] with the remote while the detectives are searching his house.

14 RP at 1849-50 (emphasis added).

Although prosecutors have wide latitude during closing argument to draw inferences from the evidence, *Thorgerson*, 172 Wn.2d at 453, it is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of the defendant. *State v. McKenzie*, 157 Wn.2d 44, 53-54, 134 P.3d 221 (2006). Nonetheless, "'there is a distinction between the individual opinion of the prosecuting attorney, as an independent fact, and an opinion based upon or deduced from the testimony in the case.'" *Id.* at 53 (emphasis omitted) (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)). To determine whether the prosecutor is expressing a personal opinion of the defendant's guilt, independent of the evidence, a reviewing court views the challenged comments in context:

> "It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence. Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion."

*Id.* at 53-54 (emphasis omitted) (quoting *State v. Papadopolous*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

The State defends the prosecutor's statements as a reasonable inference drawn from the detectives' testimony about the reaction they had

expected from Lui. However, as previously detailed, the detectives never testified that innocent people react a certain way. At most, Peters testified that a "true victim" would ask certain questions but then admitted that Lui's failure to ask those questions was not evidence of his guilt. It was, therefore, improper for the prosecutor to compare Lui's grieving process against her perceptions of how an "innocent man" grieves, especially given the vast differences in cultural and individual mourning processes.

However, for Lui to prevail on his ineffective assistance claim, he must prove more than just prosecutorial misconduct; he must prove deficient performance by defense counsel and resulting prejudice. Lui fails to prove prejudice. The State's closing encompassed 49 pages. In those 49 pages, the prosecutor described Lui's history of jealousy and control and Boussiacos's decision to leave him. The prosecutor then described how Boussiacos was unusually dressed and her luggage unusually packed when police officers discovered her body. From that evidence, the prosecutor opined that Boussiacos was probably murdered at night because she wore sweat pants only to bed and was wearing them when she was found. This evidence pointed to Lui as the assailant since he was home alone with Boussiacos that evening. Indeed, phone records documented that Lui was awake and called his sister at 1:30 a.m. that morning, even though he

claimed to be sleeping at the time. The prosecutor explained that whatever the substance of that conversation was, it gave his sister reason to question whether Lui had a role in Boussiacos's disappearance. The prosecutor also highlighted the presence of DNA matching Lui's paternal bloodline on Boussiacos's shoelaces, the many inconsistent statements he told the police throughout the investigation, and the scent track evidence that traced Lui's scent particles from Boussiacos's car at the WAC to his home.

Lui has not proved by a reasonable probability that the result of trial would have been different in the absence of the prosecutor's singular reference to the behaviors of an innocent man. Thus, Lui's claim of ineffective assistance fails.

Lui's separate due process claim based on the same prosecutorial misconduct similarly fails. Because Lui failed to object at trial, the claim is waived unless he can show that the misconduct was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice" and was incurable by a jury instruction. *Stenson,* 132 Wn.2d at 719. Even if the prosecutor's discussion of the "innocent man" were sufficiently flagrant and ill intentioned, we do not find the prosecutor's singular reference to the behaviors of an innocent man, when considered in context with the State's entire closing argument, produced pervasive prejudice in the minds of the

jury and was incapable of being remedied by a curative instruction.

### K. Lui's Religion

Lui practices the Mormon faith. He contends that the State improperly commented on his religion in violation of article I, section 11 of our state constitution and that his counsel was ineffective for failing to object. Our state constitution does not prohibit all questions pertaining to one's religion. *See, e.g., State v. Dhaliwal*, 150 Wn.2d 559, 579-80, 79 P.3d 432 (2003) (permissible for prosecutor in an assault case to question a witness about the importance of respect in Sikh culture to establish a possible motive for that assault). It guarantees only that no person "shall . . . be incompetent as a witness or juror, in consequence of his opinion on matters of religion, nor be questioned in any court of justice touching his religious belief to affect the weight of his testimony." CONST. art. I, § 11; *see also* ER 610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness'[s] credibility is impaired or enhanced.").

The State elicited testimony regarding Lui's religion because it provided context to the case. During his interview with detectives, Lui claimed he and Boussiacos had reconciled and explained he was sleeping on the couch the night Boussiacos disappeared only because they had decided

to abstain from sexual intercourse until their wedding in order to live more consistently with the tenets of his Mormon faith.[12]

The State sought to discredit Lui's claim that he and Boussiacos had reconciled and therefore he had no motive to kill her. Because Lui did not testify, the State instead questioned Lui's friend Taumoefolau, who was also a practicing Mormon. During cross-examination, the prosecutor asked Taumoefolau whether he and Lui were practicing Mormons and whether he knew Lui had an affair with another woman when he was with Boussiacos. The State then inquired whether it was against the Mormon faith to have premarital sex, to live with someone outside of marriage, to drink (presumably alcohol), to smoke (presumably cigarettes), and to consume caffeine. The State also asked Taumoefolau about the date and significance of attending stake[13] conference meetings in their religion. The State asked these questions to highlight a critical inconsistency in Lui's statements, which was that if his faith were as important to him as he claimed, why did he engage in premarital sex with multiple women, and why was he inexplicably absent from the stake conference meeting on Sunday—the day

---

[12] Lui's audiotaped statements were played to the jury but not designated as part of the record for review. The State, however, described substantive parts of his statements during closing. Lui carries the burden in an ineffective assistance of counsel claim to prove these descriptions are inaccurate.

[13] Although the trial transcript refers to this meeting as a "state" conference, Lui clarifies that they meant "stake" conference. Reply on Pers. Restraint Pet. at 19 n.4.

after Boussiacos's disappearance—when he claimed he did not know she was missing until the following Monday.

The record shows the State's questioning was calculated to provide foundation for permissible arguments and not meant to impermissibly affect the weight or credibility of Tamouefolau's testimony. Lui's ineffective assistance claim and separate claim of prosecutorial misconduct based on the same alleged violation of his religious freedom fail as a result.

L. Cumulative Error

Lui argues that if we find the above errors do not result in sufficient prejudice individually, their combined prejudice does. "The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial." *In re Pers. Restraint of Cross*, 180 Wn.2d at 690 (citing *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012)). As the petitioner, Lui bears the burden of showing the accumulated prejudice from multiple trial errors resulted in substantial prejudice that denied him a fair trial. *Id.* Lui has not met this burden.

Even if we assume Savage was sleeping at some point during trial or that it was unreasonable for him to not present evidence of Lui's arm injury to the jury (issues we do not decide), Lui fails to show how these errors, when combined with the prosecutor's singular comment about the expected

reactions of an "innocent man," resulted in substantial prejudice. The errors are completely unrelated, and any prejudice caused by them was extremely minor. Lui has not proved substantial prejudice that warrants a new trial.

II. *State's Duty To Disclose Gulla's Disciplinary File under* Brady

Lui contends the State violated its affirmative duty under *Brady* to disclose Gulla's disciplinary file. Under *Brady* and its progeny, the prosecution has an affirmative duty to learn of and disclose any impeachment evidence known to the prosecution that is material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280-81, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). This duty extends to information held by others acting on the government's behalf, not just those facts within the prosecutor's file. *State v. Davila*, 184 Wn.2d 55, 71, 357 P.3d 636 (2015). This includes the disclosure of personnel records. *Id.*

As previously discussed, before trial, the State moved to exclude references to Gulla's disciplinary history as detailed in the *Seattle Post-Intelligencer* article. The article investigated several allegations of misconduct lodged against Gulla throughout his years of service and noted there were additional allegations in Gulla's disciplinary file that the newspaper was unable to investigate because they involved unfounded allegations that were withheld by the police department from public

46

disclosure.

Lui fails to carry his burden of proving a *Brady* violation. *See id.* at 69; *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 487, 276 P.3d 286 (2012). "[T]o establish a *Brady* violation, a defendant must demonstrate the existence of each of three necessary elements: '[(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.'" *State v. Mullen*, 171 Wn.2d 881, 895, 259 P.3d 158 (2011) (most alterations in original) (quoting *Strickler*, 527 U.S. at 281-82). "The mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial . . . does not establish 'materiality' in the constitutional sense." *State v. Kwan Fai Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (1986), *rejected on other grounds by State v. Hill*, 123 Wn.2d 641, 645-47, 870 P.2d 313 (1994) (rejecting rule requiring independent appellate evaluation of trial court findings when constitutional rights are involved). Nor does a "broad, unsupported claim that the police officers' personnel files *may* lead to material information . . . justify automatic disclosure of the documents." *State v. Blackwell*, 120 Wn.2d 822, 829, 845 P.2d 1017 (1993).

Lui fails to present any specific evidence that the State suppressed that would form the basis of a *Brady* violation. Instead, he argues the State should be required to turn over Gulla's entire file so that he can assess whether it contains material impeachment information, particularly with respect to those unfounded allegations referenced in the *Seattle Post-Intelligencer* article. But "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government]'s files." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). Nor is a defendant entitled to an in camera inspection of an officer's disciplinary file absent a showing that those records are unavailable to him or her. *Cf. id.* at 57-58 (granting in camera review of *confidential* records). Although Lui provides evidence establishing that he was unable to obtain Gulla's complete disciplinary file through a public records request in 2009, he fails to show the same result would occur now following our 2011 decision in *Bainbridge Island Police Guild v. City of Puyallup*, 172 Wn.2d 398, 418, 259 P.3d 190 (2011) (lead opinion) (requiring the production of public records related to unsubstantiated allegations of sexual assault within officer's disciplinary file); *id.* at 431 (Madsen, C.J., concurring) (same).[14]

---

[14] The availability of records through a public records request does not alleviate or excuse

48

Because Lui fails to prove there was material exculpatory or inculpatory information in Gulla's disciplinary file, we do not address whether the State would have been required to disclose that information under *Brady* if the information involved unfounded or unsubstantiated allegations.

### III. *Juror Misconduct*

Next, Lui contends that he is entitled to a new trial because a juror mentioned to another juror during jury deliberations that she thought Taumoefolau, whom she referred to by his nickname Sam, said he and Lui were posting flyers at the shopping mall near the WAC and that she knew that testimony could not be true because the shopping mall was not built until after the murder occurred.

Central to our jury system is the secrecy of jury deliberations. *See Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d 127, 131, 368 P.3d 478 (2016). This does not mean that jury discussions are immune from judicial review. Jurors can engage in reversible misconduct when they inject extrinsic evidence into jury deliberations because in doing so, they strip a

---

the government of its affirmative duty to learn of and disclose any exculpatory or impeachment evidence known to the prosecution or others working on its behalf. *Strickler*, 527 U.S. at 280-81. For this reason, the reasonable probability standard for obtaining relief from a *Brady* violation is less onerous than the "probably would have resulted in acquittal" standard for newly discovered evidence. *United States v. Agurs*, 427 U.S. 97, 109-11, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

defendant of the opportunity to object, cross-examine, explain, or otherwise rebut that evidence. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 199 n.3, 75 P.3d 944 (2003). To balance these competing rights, courts will not consider allegations of jury misconduct that inhere in the verdict. *Long*, 185 Wn.2d at 131-32. Matters that inhere in the verdict include "facts 'linked to the juror's motive, intent, or belief, or describ[ing] their effect upon' the jury" or facts that cannot be rebutted by other testimony without probing any juror's mental processes. *Id.* (alteration in original) (quoting *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651 (1962)). "Only if a court concludes that juror declarations allege actual facts constituting misconduct, rather than matters inhering in the verdict, does it proceed to 'decide the effect the proved misconduct could have had upon the jury.'" *Id.* at 132 (quoting *Gardner*, 60 Wn.2d at 841).

Our inquiry therefore begins with deciding whether Lui alleges juror misconduct that inheres in the verdict. *Id.* at 131. Lui submits the following declaration from his private investigator:

> On or about June 16, 2008, I received a telephone call from one of the jurors, Clare Comins, in response to my telephone message. Mr. Comins informed me that during deliberations there was *discussion concerning the credibility of one of Mr. Lui's defense witnesses*, a man named Sam. Comins recalled Sam testifying that both he and Mr. Lui had distributed missing person's leaflets at a particular mall. The mall was outside the area of the aerial photographs that had been introduced as exhibits in the case, but Sam described the

location. During deliberations, one of the female jurors explained that she had lived in Woodinville at the time of the murder and she knew that the mall described by Sam could not possibly have been leafleted in the days following Ms. Boussiacos's disappearance because the mall had not yet been built. *The other jurors discussed how Sam's misstatement concerning the existence of the mall reflected poorly on his overall testimony.*

App. to Pers. Restraint Pet. at 65-66 (Decl. of Denise Scaffidi) (emphasis added). Jury discussions about Taumoefolau's credibility and the date the mall was constructed are matters that inhere in the verdict. *See Cox v. Charles Wright Academy, Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967). As the emphasized text above illustrates, the challenged discussion touched on the mental processes by which individual jurors arrived at the verdict, the effect Taumoefolau's testimony had on the jury, and the weight particular jurors may have given Taumoefolau's testimony.[15]

IV.    *Newly Discovered DNA Evidence*

Finally, Lui asserts he is entitled to a new trial based on newly discovered DNA evidence. "Newly discovered evidence is grounds for relief in a personal restraint petition if those facts 'in the interest of justice require' vacation of the conviction or sentence." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319, 868 P.2d 835 (1994) (quoting RAP 16.4(c)(3)).

---

[15] Because Lui's challenge inheres in the verdict, we do not consider the State's argument that the affidavit from Lui's investigator relaying what a juror told her is insufficient to support a claim of jury misconduct, or Lui's corresponding argument that he is entitled to a reference hearing if his investigator's affidavit is insufficient.

To prevail, a "defendant must show: 'that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching.'" *Id.* at 319-20 (quoting *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

Boussiacos purchased her car used. At trial, the State acknowledged the police had found a bloodstain on the gearshift skirt of Boussiacos's car and that DNA extracted from the stain did not match Lui's or any other DNA profile in the police database at the time. It was not until Alesandro Biagi was arrested in 2009 that police learned the bloodstain belonged to him. Thus, there is no dispute that Lui could not have discovered Biagi's identity before trial. Lui, however, fails to show how the jury's knowledge of Biagi's identity would have altered the result of the trial. The jury already knew there was blood on the gearshift skirt that belonged to someone else. *See, e.g.*, 9 RP at 1224. The only thing the jury did not know was that the bloodstain belonged to Biagi.[16]

Apart from the bloodstain, Lui presents no evidence that Biagi knew

---

[16] Lui presents no evidence linking Biagi to the unidentified fingerprints on Boussiacos car, the unidentified male DNA on Boussiacos's shoelaces, or the unidentified semen in her vaginal wash. Wash. Supreme Court oral argument, *In re Pers. Restraint of Lui*, No. 92816-9 (Feb. 2, 2017), at 43 min., 37 sec. to 44 min., 23 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. The sole evidence linking Biagi to Boussiacos's murder is his blood on the gearshift skirt.

or was somehow connected to Boussiacos. Biagi's statements to the police establish that he was living in Seattle (not Woodinville) around the time Boussiacos was murdered and that he was in the business of repairing, selling, and detailing used cars. Biagi did not recall having ever worked on Boussiacos's car, though he believed she looked familiar even though he could not pinpoint when or where he might have seen her. He may have seen her at the 24 Hour Fitness gym where she formerly worked, though she had not worked there since 1999 (over two years before her death). Biagi explained that although he was not a member of the gym where Boussiacos used to work, his membership subscription allowed him to visit all affiliate 24 Hour Fitness gyms and that he would occasionally go to gyms closer to his friends' homes. He also stated that it was possible that he may have visited the WAC gym where Boussiacos's body was found at some point when he was living in Washington.

Evidence that Biagi *may* have seen Boussiacos before and *may* have attended the gym where her body was found at some point in time is not enough to warrant a new trial, especially when the jury knew the bloodstain on the gearshift skirt belonged to someone other than Lui. Without more, Biagi's connection to Boussiacos is too tenuous to show evidence of his identity would probably have changed the result of trial.

Lui contends that the jury may have been persuaded by evidence that Biagi legally changed his name shortly after Boussiacos's murder and had prior convictions for assaulting a security guard during a shoplifting attempt at a Goodwill store in 2009, felony forgery in 1997, and felony possession of stolen property in 1996. But Lui does not explain how these theft-related crimes would be admissible in a murder-by-strangulation trial where there was no evidence of theft or unlawful entry. *See* ER 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," though it "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). Moreover, Biagi provided an explanation for his name change. He explained that in 2001, he had applied for a job in New York and was ultimately rejected due to his criminal history. He changed his legal name afterward because he believed it would allow him to circumvent future background checks. Evidence of Biagi's name change and criminal history is insufficient to prove that had the jury known the bloodstain on Boussiacos's gearshift belonged to Biagi, they would have reached a different result.

CONCLUSION

We affirm the Court of Appeals's denial of Lui's claims and dismissal of his personal restraint petition. Lui is not entitled to a new trial due to ineffective assistance of counsel, prosecutorial misconduct, or newly discovered evidence. Nor is he entitled to a reference hearing to determine whether counsel was sleeping at trial or whether the State withheld exculpatory or impeachment *Brady* evidence, or to prove his juror misconduct claim.

Gonzàlez, J.

WE CONCUR:

Fairhurst, C.J.

Stephens, J.

Wiggins, J.

Siddoway J. P.T

56

*In re Pers. Restraint of Lui (Sione P.)*

No. 92816-9

MADSEN, J. (dissenting)—In this personal restraint petition (PRP), Sione Lui has alleged errors that warrant a reference hearing consistent with Rule of Appellate Procedure (RAP) 16.11(b). In particular, Lui's ineffective assistance of counsel claims based on the dog scent-tracking expert evidence and defense counsel's attentiveness at trial merit further fact-finding. Because the majority dismisses Lui's PRP without first ordering a reference hearing, I respectfully dissent.

Under RAP 16.11(b), if a PRP cannot be determined solely on the record, this court will transfer the petition to the superior court for a reference hearing. The findings of fact from that reference hearing then aid the appellate court in deciding whether the petition has merit. RAP 16.13. To obtain a reference hearing, a petitioner must show that he has competent, admissible evidence to establish the facts that entitle him to relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

First, Lui has made a sufficient showing to warrant a reference hearing addressing whether his counsel was ineffective for failing to use an expert to dispute the State's scent-tracking evidence. With his PRP, Lui submitted a declaration of James Ha, PhD. Pers. Restraint Pet., App. 14. Dr. Ha has a PhD in zoology with a specialization in

animal behavior. He has testified in several cases—both civil and criminal—about scent-tracking evidence. According to Dr. Ha, the accuracy of scent-tracking decreases each day of delay following the establishment of the scent track. The oldest documented successful scent track was 13 days old. This led Dr. Ha to conclude that, given the low probability of a dog following an 11-day-old trail, it was more likely that the dog in Lui's case followed a scent that was established more recently. Further, Dr. Ha stated that a dog cannot tell when a scent particle left a person's body, so if a person had been in the area more than once, the dog would not be able to distinguish between a scent trail established earlier and one established later.

Contrary to Dr. Ha's declaration, the State's expert testified that his dog could distinguish between scents left by the same person on different days. 8 Report of Proceedings at 1100-07. It is hard to overstate the importance of the scent-tracking testimony; it was the only piece of evidence tying Lui to the location of the victim's body. Whether Lui left his scent 11 days prior when disposing of the victim's body or 8 days prior when distributing fliers was a critical fact for the jury to decide. Given Dr. Ha's unequivocal statements that a scent-tracking dog is not capable of what the State's expert alleged and the importance of the evidence, we should order a reference hearing to further explore whether counsel was ineffective in how he handled the issue before dismissing Lui's PRP.

Second, Lui has made a sufficient showing to warrant a reference hearing on the issue of whether his counsel, Anthony Savage, was functionally absent from critical

2

stages of trial due to his declining health and allegations that he slept during trial. A defendant's counsel sleeping through substantial or critical portions of trial can support a finding of ineffective assistance of counsel. *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 145 n.6, 385 P.3d 135 (2016) (citing *Burdine v. Johnson*, 262 F.3d 336, 348 (5th Cir. 2001) (unconscious counsel functionally absent throughout critical stages of trial warranted presumption of prejudice); *Javor v. United States*, 724 F.2d 831, 833 (9th Cir. 1984) (functionally treating sleeping defense counsel as structural error)). As courts have acknowledged, "[S]leeping counsel is tantamount to no counsel at all." *United States v. DiTommaso*, 817 F.2d 201, 216 (2d Cir. 1987).

The record shows that Savage, who was approximately 78 years old at the time of trial, injured his knee partway through trial. Lui submitted several declarations from people present at trial who had concerns about Savage's health and attentiveness, both before and after counsel's injury. App. to Pers. Restraint Pet. at 5 (Decl. of Celese Lui), 26-27 (Decl. of Sione Lui), 28-29 (Decl. of Ray Taylor), 30-31 (Decl. of Grant Mattson), 32 (Decl. of William Harris), 34 (Decl. of Joan Byers). These declarations identify a number of concerns regarding Savage's mental and physical health, including dozing during trial, not recalling conversations from interviews, being disoriented, not being alert, not being engaged, appearing to be in a great deal of pain, and moving and talking noticeably slower after his accident. In response, the State submitted a declaration from Savage. State's Resp. to Pers. Restraint Pet., App. C. According to Savage, he never fell asleep during trial and if he had, it would have been in full view of the judge and

prosecutors, none of whom raised a concern. Further, he was attentive during trial, did not take any narcotic medication after his accident, and had no mental impediment.

The majority declines to grant a reference hearing to determine if Savage was functionally absent during critical stages of the trial because, in its view, Lui has failed to establish prejudice. Majority at 9-10. But the question of prejudice is more appropriately addressed after the reference hearing because the findings of fact from such a hearing could determine whether there is a presumption of prejudice. A reference hearing could show, consistent with the declarations that Lui submitted, that Savage was functionally absent throughout critical stages, which may warrant a presumption of prejudice.

I recognize that a reference hearing on this matter may be difficult in light of Savage's passing in January 2012. But such a hearing would not be impossible. As shown by the six declarations that Lui submitted on the matter, there were many witnesses who can attest to Savage's performance at trial. Further, the superior court could consider Savage's other cases and how his health impacted his performance and attentiveness at those trials. For example, another of Savage's clients made similar allegations of inattentiveness and sleeping during trial in a case after Lui's. *See State v. Huber*, No. 67776-4-I (Wash. Ct. App. Dec. 23, 2013) (unpublished), http://www.courts.wa.gov/opinions/pdf/677764.pdf. Although the Court of Appeals ultimately dismissed that PRP, the case could provide a useful look into Savage's health and ability to be an effective advocate at that stage of his career. Given the importance of effective counsel and the multitude of concerns regarding Savage's health and

4

attentiveness during trial raised in the declarations, ordering a reference hearing on the matter is appropriate before dismissing Lui's PRP.

Because the majority dismisses Lui's PRP without first ordering a reference hearing to further explore the alleged errors, I respectfully dissent.

.

Madsen, J.